In the Matter of TESSIM ZORACH et al., Petitioners, against ANDREW G. CLAUSON, JR., et al., Constituting the BOARD OF EDUCATION OF THE CITY OF NEW YORK, et al., Respondents, and GREATER NEW YORK CO-ORDINATING COMMITTEE ON RELEASED TIME OF JEWS, PROTESTANTS AND ROMAN CATHOLICS, Intervener, Respondent.

Supreme Court, Special Term, Kings County, June 19, 1950.

*Kenneth W. Greenawalt, Leo Pfeffer, Edwin Lukas* and *Sol Rabkin* for petitioners.

*John P. McGrath, Corporation Counsel* (*Michael A. Castaldi* and *Arthur H. Kahn* of counsel), for Board of Education of the City of New York, respondent.

*Nathaniel L. Goldstein, Attorney-General* (*John P. Powers* and *Louis Winer* of counsel), for Francis T. Spaulding, as Commissioner of Education of the State of New York, respondent.

*Charles H. Tuttle, Porter R. Chandler* and *Louis M. Loeb* for intervener, respondent.

Di GIOVANNA, J. This is an application pursuant to article 78 of the Civil Practice Act for the following relief:

(1.) Directing a trial in respect of issues of fact raised by the pleadings and accompanying papers;

(2.) The hearing of any objections in point of law in relation to the pleadings;

(3.) Argument upon the merits of petitioners' application, and

(4.) Such other and further relief as may be just and proper.

The petitioners allege that they are citizens, taxpayers and parents of children attending public elementary schools in the borough of Brooklyn, city of New York. The respondents are the board of education of the city of New York, the Commissioner of Education of the State of New York, and The Greater New York Co-ordinating Committee on Released Time of Jews, Protestants and Roman Catholics, as intervener-respondent.

The objective sought by this proceeding is to review the determination of the board of education of the city of New York and the State Commissioner of Education in establishing what is commonly known as the " released time program " of religious instruction now in practice in the public schools of this city and elsewhere throughout this State with the ultimate aim of compelling the discontinuance of this program. Varying practices having developed in " released time programs," in order to insure uniformity and legality the Legislature of the State of New York enacted chapter 305 of the Laws of 1940, amending section 625 of the Education Law (now Education Law, § 3210) by adding thereto the following sentence: " Absence for religious observance and education shall be permitted under rules that the commissioner shall establish."

It is enlightening to quote, at this point, the memorandum handed down by Governor Lehman when he signed this bill, which reads as follows:

" Under this bill the State Commissioner of Education shall establish rules under which children may on certain occasions be permitted to leave school for the purpose of attending their religious observances and receiving religious education.

"For some time it has been the practice in many localities in the State to excuse children from school a certain period each week for religious instruction. The board of regents has recognized the right of local school boards to do this. The Court of Appeals unanimously held that the practice was within the letter and the spirit of our Constitution and laws. In so holding the Court of Appeals pointed out: 'Neither the Constitution nor the law discriminates against religion. Denominational religion is merely put in its proper place outside of public aid or support.'

"However, at the present time there is no uniformity of practice throughout the State. Nor is any officer or agency of the State authorized or charged with the responsibility of adopting rules under which absences for religious observance or instruction may be permitted. This bill will assure some uniformity and permanency by placing the authority and responsibility upon the State Commissioner of Education to adopt such rules.

"A few people have given voice to fears that the bill violates principles of our Government. These fears in my opinion are groundless. The bill does not introduce anything new into our public school system nor does it violate the principles of our public educational system."

To effectuate this legislation, the State Commissioner of Education on July 4, 1940, issued the following regulations which, as amended, are:

"1. Absence of a pupil from school during school hours for religious observance and education to be had outside the school building and grounds will be excused upon request in writing signed by the parent or guardian of the pupil.

2. The courses in religious observance and education must be maintained and operated by or under the control of duly constituted religious bodies.

3. Pupils must be registered for the courses and a copy of the registration filed with the local public school authorities.

4. Reports of attendance of pupils upon such courses shall be filed with the principal or teacher at the end of each week.

5. Such absence shall be for not more than one hour each week at the close of a session at a time to be fixed by the local school authorities.

6. In the event that more than one school for religious observance and education is maintained in any district, the hour for absence for each particular public school in such district shall be the same for all such religious schools." (Regulations of Comr. of Educ., art. 17, § 154; N. Y. Official Compilation of Codes, Rules and Regulations, p. 683.)

Thereafter, on November 13, 1940, the board of education of the city of New York promulgated the following rules and regulations which are presently in full force and effect:

"1. A program for religious instruction may be initiated by any religious organization, in cooperation with the parents of pupils concerned. There will be no announcement of any kind in the public schools relative to the program.

2. When a religious organization is prepared to initiate a program for religious instruction, the same organization will notify parents to enroll their children with the religious organization, and will issue to each enrolled pupil a card countersigned by the parent and addressed to the principal of the public school, requesting the release of the pupil from school for the purpose of religious instruction at a specific location. The said cards will be filed in the office of the public school as a record of pupils entitled to be excused, and will not be available or used for any other purpose.

3. Religious organizations, in cooperation with parents, will assume full responsibility for attendance at the religious center and will file with the school principal, weekly, a card attendance record and in cases of absence from religious instruction, a statement of the reason therefor.

4. Upon the presentation of a proper request as above prescribed, pupils of any grade will be dismissed from school for the last hour of the day's session on one day of each week to be designated by the Superintendent of Schools. A different day may be designated for each borough.

5. Pupils released for religious instruction will be dismissed from school in the usual way and the school authorities have no responsibility beyond that assumed in regular dismissals.

6. There shall be no comment by any principal or teacher on the attendance or non-attendance of any pupil upon religious instruction."

Since the release of any child for one hour a week for religious instruction is at the option of the parents of the child, the parent who desires to have his or her child so released is required to fill out a card, the form of which is as follows:

REGISTRATION FOR RELEASED TIME
RELIGIOUS INSTRUCTION
New York City ................ 194.

To .................... Principal of ............ (School)

Please excuse my child, ................ of grade .........

one hour weekly on .............. throughout the rest of this school year, beginning ................. to go for religious

instruction at ........................................
(Name of Center to which child is to go)

(a) ........................................................
(Signature of parent or guardian)

Address ............................... Phone ............

(b) Provision has been made to accommodate and instruct this pupil

........................................
(Signature of Clergyman)

(Card to be retained and filed by the Public School)
RS-1

Such registration cards are prepared and distributed either by the intervener-respondent, an organization wholly independent of the school system, or by a particular religious organization. No member or employee of either of the other respondents participates in any way in the distribution of the cards, the distribution taking place entirely outside of school premises. No expense of this program is borne directly or indirectly by either of the other respondents. When the card has been filed in the school by the parent and the principal has notified the teacher that the pupil shall be released at 2:00 P.M. on the designated day for religious instruction then, without further announcement by the teacher, the child may leave the class and school grounds at the designated time and proceed immediately to the location specified on the card for religious instruction.

Education is a process for the mental, physical and moral development of human beings. Throughout history, man has sought some form of religious worship as an influence toward his moral development. The fundamental idea of a Supreme Being requiring worship has become inbred in the mind of man. The idea of worship in varying forms has prevailed in the minds and hearts of man throughout the ages. Formal religions, too numerous and antithetical to be reconcilable, have arisen and flourished; their followers even became mortal enemies because of discord created by diversity of religious beliefs.

When the founding fathers of this country set about their task of adopting an organic law for this new nation, they did not deny the value of religion, but wisely determined that all creeds could live together more harmoniously if no creed was given preference. Therefore, in this country there has been developed a formal separation of church and state, which does

not deny the value of any formal religion, but is per se, a guarantee of freedom of worship.

Recognition of the value of religious instruction as an educational contribution to the moral development of man began to take definite shape in this jurisdiction about a quarter of a century ago and has developed into the "released time program." "What more logical advance could be made in the science of sociology than the unification of religious leaders in a coordinated effort to teach children faith and morality — and for that purpose to excuse them from schools for one hour a week to go to the church or tabernacle or synagogue of their parents' choice?" (*Gordon* v. *Board of Educ. of City of Los Angeles,* 78 Cal. App. 2d 464, 474.)

The petitioners labor under the same misconception as did the petitioner in the case quoted immediately above and their concepts were criticized and rejected in the following language: "Throughout her entire argument, appellant misconceives the American principle of religious freedom. What she contends for is freedom *from* religion rather than freedom *of* religion. Appellant's argument leads one to the conclusion that the doctrine of separation of church and state looks upon religion as something intrinsically evil, and against which there should be a rigid quarantine. Nothing is farther from the true concept of the American philosophy of government than such an argument. In the constitution of every state of the union is to be found language which either directly, or by clear implication, recognizes a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well-being of the community." (*Gordon* v. *Board of Educ. of City of Los Angeles, supra,* p. 476.)

The lines immediately following cite the preamble to the Constitution of the State of California which is almost exactly the wording of the preamble to the Constitution of the State of New York, which latter reads as follows: "WE, THE PEOPLE of the State of New York, grateful to Almighty God for our Freedom, in order to secure its blessings, DO ESTABLISH THIS CONSTITUTION."

It is in recognition of this principle that separation of church and state has never meant freedom *from* religion but rather freedom *of* religion.

To permit restraint upon State and local educational agencies which are lawfully authorized to grant released time to our young citizens who wish to take religious instruction would constitute a suppression of this right " of " religious freedom.

It is tantamount to a denial of a basic right guaranteed by the letter and the spirit of our American concept of government. It would be a step in the direction of and be consonant with totalitarian and communistic philosophies existing in jurisdictions wherein atheism and the suppression of all religions are preferred to the freedom of the individual to seek religious instruction and worship. Such would be the result or conclusion if the relief sought herein by the petitioners was to be granted.

" Released time programs " have been the subjects of judicial review in many jurisdictions within this country for two and one-half decades. Among the first of these cases was involved the test of a plan used in White Plains, N. Y., which seems to have been identical with that here attacked. That plan was held constitutional in the Supreme Court at Special Term, in the Appellate Division and in the Court of Appeals, without a single dissent. " Neither the Constitution nor the law discriminates against religion. Denominational religion is merely put in its proper place outside of public aid or support. As a matter of educational policy, the Commissioner doubtless may make proper regulations to restrict the local authorities when the administration of the plan of week-day instruction in religion or any plan of outside instruction in lay subjects in his judgment interferes unduly with the regular work of the school." (*People ex rel. Lewis* v. *Graves,* 245 N. Y. 195, 198.)

Subsequent to the decision of the Supreme Court of the United States in *Illinois ex rel. McCollum* v. *Board of Educ. of School Dist. No. 71, Champaign Co.* (333 U. S. 203), another proceeding under article 78 of the Civil Practice Act was initiated in an attack upon this program (*Matter of Lewis* v. *Spalding,* 193 Misc. 66, appeal withdrawn 299 N. Y. 564.) In that proceeding the relief sought was (1) to discontinue the practice of releasing children from regular school attendance permitting them to receive religious instruction, (2) to discontinue the existing rules or regulations providing therefor, and (3) restraining the adoption of such rules or regulations in the future. The demands therein sought a peremptory order, which was denied; in the instant case, there is in effect a restatement of demands calculated to raise issues of fact. The paramount legal question in the aforesaid case, namely, the constitutionality of the statute and regulations, having been determined adversely to the petitioner therein, a similar determination must be reached herein.

The program in operation in the city and State of New York is radically dissimilar from the Champaign Plan, which the United States Supreme Court in the *McCollum* case (*supra*)

declared to be unconstitutional; the differences may be illustrated best by setting in apposition distinctive features of both.

| *Champaign Plan* | *New York City Plan* |
|---|---|
| 1. No underlying enabling State statute. | 1. Section 3210 of the Education Law is the enabling statute which provides that "absence from required attendance shall be permitted only for causes allowed by the general rules and practices of the public schools"; and further provides that "absence for religious observance and education shall be permitted under rules that the commissioner shall establish." |
| 2. Religious training took place in the school buildings and on school property. | 2. Religious training takes place outside of the school buildings and off school property. |
| 3. The place for instruction was designated by school officials. | 3. The place for instruction is designated by the religious organization in cooperation with the parent. |
| 4. Pupils taking religious instruction were segregated by school authorities according to religious faith of pupils. | 4. No element of segregation is present. |
| 5. School officials supervised and approved the religious teacher. | 5. No supervision or approval of religious teachers or course of instruction by school officials. |
| 6. Pupils were solicited in school buildings for religious instruction. | 6. School officials do not solicit or recruit pupils for religious instruction. |
| 7. Registration cards distributed by school. In at least one instance, the registration cards were printed at the expense of school funds. | 7. No registration cards furnished by the school or distributed by the school. No expenditure of public funds involved. |
| 8. Nonattending pupils isolated or removed to another room. | 8. Nonattending pupils stay in their regular classrooms continuing significant educational work. |
| | 9. No credit given for attendance at the religious classes. |
| | 10. No compulsion by school authorities with respect to attendance or truancy. |
| | 11. No promotion or publicizing of the released time program by school officials. |
| | 12. No public moneys are used. |

Section 3210 of the Education Law, as implemented by the respective regulations of the State Commissioner and the board of education, is objected to by the petitioners herein as unconstitutional.

In *Everson* v. *Board of Educ. of Town of Ewing* (330 U. S. 1, 16) we are reminded: " we must not strike that state statute down if it is within the State's constitutional power even though it approaches the verge of that power."

In the same case (pp. 15–16) it is stated that: " The ' establishment of religion ' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force or influence a person to go or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*"

The recent and much-quoted decision of the Supreme Court of the United States in *Illinois ex rel. McCollum* v. *Board of Educ. of School Dist. No. 71, Champaign Co. (supra)* which declared unconstitutional the so-called Champaign Plan, was arrived at on the facts of that case. In so doing, Mr. Justice FRANKFURTER expressly stated (p. 226): " The substantial differences among arrangements lumped together as ' released time ' emphasize the importance of detailed analysis of the facts to which the Constitutional test of Separation is to be applied."

And again (p. 227), the same Justice said: " Religious education so conducted on school time and property is patently woven into the working scheme of the school. The Champaign arrangement thus presents powerful elements of inherent pressure by the school system in the interest of religious sects."

In the very opinion holding the Champaign Plan unconstitutional, Mr. Justice FRANKFURTER further said (p. 230): " If that were all, Champaign might have drawn upon the French system, known in its American manifestation as ' dismissed time,' whereby one school day is shortened to allow all children to go where they please, leaving those who so desire to go to a **religious school.**"

As a further indication that the plan before this court is consistent with this judicial reasoning, the same court said (p. 231): '' We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as ' released time,' present situations differing in aspects that may well be constitutionally crucial. Different forms which ' released time ' has taken during more than thirty years of growth include programs which, like that before us, could not withstand the test of the Constitution; others may be found unexceptionable. We do not now attempt to weigh in the Constitutional scale every separate detail or various combination of factors which may establish a valid ' released time ' program. We find that the basic Constitutional principle of absolute Separation was violated when the State of Illinois, speaking through its Supreme Court, sustained the school authorities of Champaign in sponsoring and effectively furthering religious beliefs by its educational arrangement.''

In discussing the objection that a child whose parents do not choose for him any form of religious instruction may be classed as a dissenter and thereby humiliated, Mr. Justice JACKSON, in his concurring opinion, said in the same case (p. 233): '' Even admitting this to be true, it may be doubted whether the Constitution which, of course, protects the right to dissent, can be construed also to protect one from the embarrassment that always attends nonconformity, whether in religion, politics, behavior or dress. Since no legal compulsion is applied to complainant's son himself and no penalty is imposed or threatened from which we may relieve him, we can hardly base jurisdiction on this ground.''

Coinciding with the views of Mr. Justice FRANKFURTER, Mr. Justice JACKSON in the same case continued (p. 237): '' The opinions in this case show that public educational authorities have evolved a considerable variety of practices in dealing with the religious problem. Neighborhoods differ in racial, religious and cultural compositions. It must be expected that they will adopt different customs which will give emphasis to different values and will induce different experiments. And it must be expected that, no matter what practice prevails, there will be many discontented and possibly belligerent minorities. We must leave some flexibility to meet local conditions, some chance to progress by trial and error.''

In what amounts to a summation of the entire proposition involving voluntary religious instruction, in the same opinion, Mr. Justice JACKSON said (p. 235). '' To me, the sweep and

detail of these complaints is a danger signal which warns of the kind of local controversy we will be required to arbitrate if we do not place appropriate limitation on our decision and exact strict compliance with jurisdictional requirements. Authorities list 256 separate and substantial religious bodies to exist in the continental United States. Each of them, through the suit of some discontented but unpenalized and untaxed representative, has as good a right as this plaintiff to demand that the courts compel the schools to sift out of their teaching everything inconsistent with its doctrines. If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits."

A careful analysis of the *McCollum* case (*supra*) leads this court to hold that the present " released time " program contains none of the objectionable features of the plan in that case which was the basis of the decision in the Supreme Court of the United States holding the plan to be unconstitutional. The subsequent decision of the courts in this State in *Matter of Lewis* v. *Spalding* (*supra*) is clearly determinative of the constitutionality of the plan under attack.

The petitioners have, in this proceeding, adopted a different prayer for relief from that sought in *Matter of Lewis* v. *Spalding* (*supra*). While continuing to attack the constitutionality of the statute and regulations involved, they seek a direction for discontinuance of the regulations on a generalized allegation of maladministration in particular instances, of which no particulars are cited.

However, the practice or practices which may grow up in the matter of administrative details do not affect the constitutionality of the statute involved, for the statute must stand or fall by itself on this question.

The attorney for the petitioners, in his memorandum relative to the merits of the petitioners' application and the legal sufficiency of the petition says: " It is submitted that it is not the details of a particular released time program which render it violative of the First Amendment; it is the basic concept — the raison d'etre of the program, which causes it to run afoul of the Amendment as interpreted in the Everson and McCollum decisions." However, the majority opinions of Mr. Justice FRANKFURTER and Mr. Justice JACKSON quoted above seem to directly negate this assertion.

In the face of a holding that the statute attacked is constitutional, we next come to the question of whether triable issues are presented. What are the issues raised by this proceeding other than the question of constitutionality? There are no degrees of constitutionality. Neither does compliance with the statute render it constitutional if it is unconstitutional, nor does administrative error render it unconstitutional if it is constitutional. It may be, conceivably, that in isolated cases a particular teacher will fail to conform to the regulatory mandates imposed by the respondents, but if such be the case, the remedy is not the invalidation of a valid statute but the imposition of a disciplinary penalty upon the violator. To prevent or redress particular instances of maladministration, ample machinery of law exists. However, that is not an issue in this special proceeding because no record has been presented of an arbitrary or capricious ruling by the respondents respecting any particular act of maladministration. This court cannot agree, therefore, with the argument of counsel for the petitioners that it has before it the question of whether or not the program is being conducted in accordance with the regulations. Indeed, there is no proof that it is not, while there is proof, immaterial to this special proceeding, that it is being so conducted in the particular schools attended by the children of these petitioners. In fact the attorney for the petitioners, in the citation from his brief above quoted, concedes that fact. The question validly presented by this proceeding is solely addressed to the constitutionality of the statute and regulations.

Previous motions made and determined by other Justices of this court have been in no sense determinative of the issues raised in this proceeding. Mr. Justice BELDOCK, and the Appellate Division (275 App. Div. 774) distinctly stated that their respective decisions determined only the proper venue. Similarly, neither Mr. Justice WALSH (195 Misc. 531, 534), nor Mr. Justice HEARN made any determination that the petition was immune from attack at this time. As a matter of fact, the Greater New York Co-ordinating Committee only became a party to this proceeding by permission of Mr. Justice WALSH and the cross motion of the said intervener in this proceeding must be considered timely.

From the above, it follows that the first prayer for relief of the petitioners, namely, that a trial be directed of the respective issues of fact raised by the pleadings and accompanying papers, must be denied because no issues exist. The second prayer for the hearing of objections in point of law in relation to the plead-

ings, has been disposed of by way of lengthy oral argument before this court and submission of voluminous briefs by all the interested parties. The third prayer, that argument be had on the merits of petitioners' applications, has been disposed of in the same manner. The court finds that assuming all of the facts set forth in the petition are deemed to be true, nothing has been shown to warrant a finding that section 3210 of the Education Law is unconstitutional or that the regulations adopted by the respondents as required by section 3210, are arbitrary or capricious or unreasonable in law or in fact.

The cross motion of the intervener-respondent, is granted. The objections of all respondents in point of law to the petition are sustained and the petition is dismissed on the merits as a matter of law.

Submit final order.