ZORACH ET AL. *v.* CLAUSON ET AL., CONSTI-
TUTING THE BOARD OF EDUCATION
OF THE CITY OF NEW YORK, ET AL.

No. 431.   Argued January 31–February 1, 1952.—Decided
April 28, 1952.

*Kenneth W. Greenawalt* argued the cause for appellants. With him on the brief were *Leo Pfeffer* and *Edwin J. Lukas.*

*Wendell P. Brown,* Solicitor General, argued the cause for the Commissioner of Education of the State of New York, appellee. With him on the brief were *Nathaniel L. Goldstein,* Attorney General, and *Ruth Kessler Toch* and *John P. Powers,* Assistant Attorneys General.

*Michael A. Castaldi* argued the cause for the Board of Education of the City of New York, appellee. With him on the brief were *Denis M. Hurley, Seymour B. Quel, Daniel T. Scannell* and *Arthur H. Kahn.*

*Charles H. Tuttle* argued the cause for the Greater New York Coordinating Committee on Released Time of Jews, Protestants and Roman Catholics, appellee. With him on the brief was *Porter R. Chandler.*

Briefs of *amici curiae* supporting appellees were filed on behalf of the States of California, by *Edmund G. Brown,* Attorney General, *William V. O'Connor,* Chief Deputy Attorney General, and *Howard S. Goldin,* Deputy Attorney General; Indiana, by *J. Emmett McManamon,* Attorney General; Kentucky, by *J. D. Buckman, Jr.,* Attorney General, and *M. B. Holifield,* Assistant Attorney General; Maine, by *Alexander A. LaFleur,* Attorney General; Massachusetts, by *Francis E. Kelly,* Attorney General, *Charles H. Walters,* Assistant Attorney General, and *William F. Marcella;* Oregon, by *George Neuner,* Attorney General, *Robert F. Maguire* and *William E. Dougherty;* Pennsylvania, by *Robert E. Woodside,* Attorney General, and *Harry F. Stambaugh;* and West Virginia, by *William C. Marland,* Attorney General, and *Thomas J. Gillooly, T. D. Kauffelt* and *Eston B. Stephenson,* Assistant Attorneys General.

Mr. Justice Douglas delivered the opinion of the Court.

New York City has a program which permits its public schools to release students during the school day so that they may leave the school buildings and school grounds and go to religious centers for religious instruction or devotional exercises. A student is released on written request of his parents. Those not released stay in the classrooms. The churches make weekly reports to the schools, sending a list of children who have been released from public school but who have not reported for religious instruction.[1]

This "released time" program involves neither religious instruction in public school classrooms nor the expendi-

---

[1] The New York City released time program is embodied in the following provisions:

(a) N. Y. Education Law, § 3210, subdiv. 1 (b), which provides that "Absence for religious observance and education shall be permitted under rules that the commissioner shall establish."

(b) Regulations of the Commissioner of Education of the State of New York, Art. 17, § 154 (1 N. Y. Official Code Comp. 683), which provide for absence during school hours for religious observance and education outside the school grounds [par. 1], where conducted by or under the control of a duly constituted religious body [par. 2]. Students must obtain written requests from their parents or guardians to be excused for such training [par. 1], and must register for the training and have a copy of their registration filed with the public school authorities [par. 3]. Weekly reports of their attendance at such religious schools must be filed with their principal or teacher [par. 4]. Only one hour a week is to be allowed for such training, at the end of a class session [par. 5], and where more than one religious school is conducted, the hour of release shall be the same for all religious schools [par. 6].

(c) Regulations of the Board of Education of the City of New York, which provide similar rules supplementing the State Commissioner's regulations, with the following significant amplifications: No announcement of any kind will be made in the public schools relative to the program [rule 1]. The religious organizations and

ture of public funds. All costs, including the application blanks, are paid by the religious organizations. The case is therefore unlike *McCollum* v. *Board of Education,* 333 U. S. 203, which involved a "released time" program from Illinois. In that case the classrooms were turned over to religious instructors. We accordingly held that the program violated the First Amendment [2] which (by reason of the Fourteenth Amendment)[3] prohibits the states from establishing religion or prohibiting its free exercise.

Appellants, who are taxpayers and residents of New York City and whose children attend its public schools,[4] challenge the present law, contending it is in essence not different from the one involved in the *McCollum* case. Their argument, stated elaborately in various ways, reduces itself to this: the weight and influence of the school is put behind a program for religious instruction; public school teachers police it, keeping tab on students who are released; the classroom activities come to a halt while the students who are released for religious instruction are on leave; the school is a crutch on which the churches are leaning for support in their religious training; without the cooperation of the schools this "released time" program,

parents will assume full responsibility for attendance at the religious schools and will explain any failures to attend on the weekly attendance reports [rule 3]. Students who are released will be dismissed from school in the usual way [rule 5]. There shall be no comment by any principal or teacher on attendance or nonattendance of any pupil upon religious instruction [rule 6].

[2] The First Amendment reads in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

[3] See *Stromberg* v. *California,* 283 U. S. 359; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Murdock* v. *Pennsylvania,* 319 U. S. 105.

[4] No problem of this Court's jurisdiction is posed in this case since, unlike the appellants in *Doremus* v. *Board of Education,* 342 U. S. 429, appellants here are parents of children currently attending schools subject to the released time program.

like the one in the *McCollum* case, would be futile and ineffective. The New York Court of Appeals sustained the law against this claim of unconstitutionality. 303 N. Y. 161, 100 N. E. 2d 463. The case is here on appeal. 28 U. S. C. § 1257 (2).

The briefs and arguments are replete with data bearing on the merits of this type of "released time" program. Views *pro* and *con* are expressed, based on practical experience with these programs and with their implications.[5] We do not stop to summarize these materials nor to burden the opinion with an analysis of them. For they involve considerations not germane to the narrow constitutional issue presented. They largely concern the wisdom of the system, its efficiency from an educational point of view, and the political considerations which have motivated its adoption or rejection in some communities. Those matters are of no concern here, since our problem reduces itself to whether New York by this system has either prohibited the "free exercise" of religion or has made a law "respecting an establishment of religion" within the meaning of the First Amendment.

---

[5] See, *e. g.*, Beckes, Weekday Religious Education (National Conference of Christians and Jews, Human Relations Pamphlet No. 6); Butts, American Tradition in Religion and Education, pp. 188, 199; Moehlman, The Wall of Separation between Church and State, pp. 123, 155 ff.; Moehlman, The Church as Educator, pp. 103 ff.; Moral and Spiritual Values in the Public Schools (Educational Policies Commission, 1951); Newman, The Sectarian Invasion of Our Public Schools; Public School Time for Religious Education, 12 Jewish Education 130 (January, 1941); Religious Instruction On School Time, 7 Frontiers of Democracy 72 (1940); Released Time for Religious Education in New York City's Schools (Public Education Association, June 30, 1943); Released Time for Religious Education in New York City's Schools (Public Education Association, June 30, 1945); Released Time for Religious Education in New York City Schools (Public Education Association, 1949); 2 Stokes, Church and State in the United States, pp. 523–548; The Status Of Religious Education In The Public Schools (National Education Association).

It takes obtuse reasoning to inject any issue of the "free exercise" of religion into the present case. No one is forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public schools. A student need not take religious instruction. He is left to his own desires as to the manner or time of his religious devotions, if any.

There is a suggestion that the system involves the use of coercion to get public school students into religious classrooms. There is no evidence in the record before us that supports that conclusion.[6] The present record indeed tells us that the school authorities are neutral in this regard and do no more than release students whose parents so request. If in fact coercion were used, if it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented.[7] Hence we put aside that claim of coercion

---

[6] Nor is there any indication that the public schools enforce attendance at religious schools by punishing absentees from the released time programs for truancy.

[7] Appellants contend that they should have been allowed to prove that the system is in fact administered in a coercive manner. The New York Court of Appeals declined to grant a trial on this issue, noting, *inter alia,* that appellants had not properly raised their claim in the manner required by state practice. 303 N. Y. 161, 174, 100 N. E. 2d 463, 469. This independent state ground for decision precludes appellants from raising the issue of maladministration in this proceeding. See *Louisville & Nashville R. Co.* v. *Woodford,* 234 U. S. 46, 51; *Atlantic Coast Line R. Co.* v. *Mims,* 242 U. S. 532, 535; *American Surety Co.* v. *Baldwin,* 287 U. S. 156, 169.

The only allegation in the complaint that bears on the issue is that the operation of the program "has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction." But this charge does not even implicate the school authorities. The New York Court of Appeals was therefore generous in labeling it a "conclusory" allegation. 303 N. Y., at 174, 100 N. E. 2d, at 469. Since

both as respects the "free exercise" of religion and "an establishment of religion" within the meaning of the First Amendment.

Moreover, apart from that claim of coercion, we do not see how New York by this type of "released time" program has made a law respecting an establishment of religion within the meaning of the First Amendment. There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment. See *Everson* v. *Board of Education,* 330 U. S. 1; *McCollum* v. *Board of Education, supra.* There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the "free exercise" of religion and an "establishment" of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the ap-

---

the allegation did not implicate the school authorities in the use of coercion, there is no basis for holding that the New York Court of Appeals under the guise of local practice defeated a federal right in the manner condemned by *Brown* v. *Western R. of Alabama,* 338 U. S. 294, and related cases.

peals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."

We would have to press the concept of separation of Church and State to these extremes to condemn the present law on constitutional grounds. The nullification of this law would have wide and profound effects. A Catholic student applies to his teacher for permission to leave the school during hours on a Holy Day of Obligation to attend a mass. A Jewish student asks his teacher for permission to be excused for Yom Kippur. A Protestant wants the afternoon off for a family baptismal ceremony. In each case the teacher requires parental consent in writing. In each case the teacher, in order to make sure the student is not a truant, goes further and requires a report from the priest, the rabbi, or the minister. The teacher in other words cooperates in a religious program to the extent of making it possible for her students to participate in it. Whether she does it occasionally for a few students, regularly for one, or pursuant to a systematized program designed to further the religious needs of all the students does not alter the character of the act.

We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state

314

encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here.

This program may be unwise and improvident from an educational or a community viewpoint. That appeal is made to us on a theory, previously advanced, that each case must be decided on the basis of "our own prepossessions." See *McCollum* v. *Board of Education, supra,* p. 238. Our individual preferences, however, are not the constitutional standard. The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree. See *McCollum* v. *Board of Education, supra,* p. 231.

In the *McCollum* case the classrooms were used for religious instruction and the force of the public school was used to promote that instruction. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction. We follow the *McCollum* case.[8] But we cannot expand it to cover the present released time program unless separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people. We cannot read into the Bill of Rights such a philosophy of hostility to religion.

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

*Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, held invalid as an "establishment of religion" an Illinois system under which school children, compelled by law to go to public schools, were freed from some hours of required school work on condition that they attend special religious classes held in the school buildings. Although the classes were taught by sectarian

---

[8] Three of us—THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE BURTON—who join this opinion agreed that the "released time" program involved in the *McCollum* case was unconstitutional. It was our view at the time that the present type of "released time" program was not prejudged by the *McCollum* case, a conclusion emphasized by the reservation of the question in the separate opinion by MR. JUSTICE FRANKFURTER in which MR. JUSTICE BURTON joined. See 333 U. S., at 225 where it was said, "Of course, 'released time' as a generalized conception, undefined by differentiating particularities, is not an issue for Constitutional adjudication. Local programs differ from each other in many and crucial respects. . . . It is only when challenge is made to the share that the public schools have in the execution of a particular 'released time' program that close judicial scrutiny is demanded of the exact relation between the religious instruction and the public educational system in the specific situation before the Court."

teachers neither employed nor paid by the state, the state did use its power to further the program by releasing some of the children from regular class work, insisting that those released attend the religious classes, and requiring that those who remained behind do some kind of academic work while the others received their religious training. We said this about the Illinois system:

"Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment . . . ." *McCollum* v. *Board of Education, supra,* at pp. 209–210.

I see no significant difference between the invalid Illinois system and that of New York here sustained. Except for the use of the school buildings in Illinois, there is no difference between the systems which I consider even worthy of mention. In the New York program, as in that of Illinois, the school authorities release some of the children on the condition that they attend the religious classes, get reports on whether they attend, and hold the other children in the school building until the religious hour is over. As we attempted to make categorically clear, the *McCollum* decision would have been the same if the religious classes had not been held in the school buildings. We said:

"Here *not only* are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State *also* affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. *This* is

not separation of Church and State." (Emphasis
supplied.) *McCollum* v. *Board of Education, supra,*
at p. 212.

*McCollum* thus held that Illinois could not constitution-
ally manipulate the compelled classroom hours of its com-
pulsory school machinery so as to channel children into
sectarian classes. Yet that is exactly what the Court
holds New York can do.

I am aware that our *McCollum* decision on separation of
Church and State has been subjected to a most search-
ing examination throughout the country. Probably few
opinions from this Court in recent years have attracted
more attention or stirred wider debate. Our insistence
on "a wall between Church and State which must be kept
high and impregnable" has seemed to some a correct ex-
position of the philosophy and a true interpretation of
the language of the First Amendment to which we should
strictly adhere.[1] With equal conviction and sincerity,
others have thought the *McCollum* decision fundamen-
tally wrong [2] and have pledged continuous warfare against
it.[3] The opinions in the court below and the briefs here
reflect these diverse viewpoints. In dissenting today, I
mean to do more than give routine approval to our *Mc-
Collum* decision. I mean also to reaffirm my faith in the

---

[1] See, *e. g.,* Newman, The Sectarian Invasion of Our Public Schools;
Moehlman, The Wall of Separation between Church and State;
Thayer, The Attack upon the American Secular School, pp. 179–199;
Butts, The American Tradition in Religion and Education, pp. 201–
208. See also Symposium on Religion and the State, 14 Law &
Contemp. Prob. 1–159.

[2] See, *e. g.,* O'Neill, Religion and Education Under the Constitution,
pp. 219–253; Parsons, The First Freedom, pp. 158–178; Van Dusen,
God in Education. See also Symposium on Religion and the State,
*supra.*

[3] See Moehlman, *supra,* n. 1, at p. 42. O'Neill, *supra,* n. 2, at pp.
254–272.

fundamental philosophy expressed in *McCollum* and *Everson* v. *Board of Education,* 330 U. S. 1. That reaffirmance can be brief because of the exhaustive opinions in those recent cases.

Difficulty of decision in the hypothetical situations mentioned by the Court, but not now before us, should not confuse the issues in this case. Here the sole question is whether New York can use its compulsory education laws to help religious sects get attendants presumably too unenthusiastic to go unless moved to do so by the pressure of this state machinery. That this is the plan, purpose, design and consequence of the New York program cannot be denied. The state thus makes religious sects beneficiaries of its power to compel children to attend secular schools. Any use of such coercive power by the state to help or hinder some religious sects or to prefer all religious sects over nonbelievers or vice versa is just what I think the First Amendment forbids. In considering whether a state has entered this forbidden field the question is not whether it has entered too far but whether it has entered at all. New York is manipulating its compulsory education laws to help religious sects get pupils. This is not separation but combination of Church and State.

The Court's validation of the New York system rests in part on its statement that Americans are "a religious people whose institutions presuppose a Supreme Being." This was at least as true when the First Amendment was adopted; and it was just as true when eight Justices of this Court invalidated the released time system in *McCollum* on the premise that a state can no more "aid all religions" than it can aid one.[4] It was precisely because Eighteenth

---

[4] A state policy of aiding "all religions" necessarily requires a governmental decision as to what constitutes "a religion." Thus is created a governmental power to hinder certain religious beliefs by denying their character as such. See, *e. g.,* the Regulations of the New York Commissioner of Education providing that, "The

Century Americans were a religious people divided into many fighting sects that we were given the constitutional mandate to keep Church and State completely separate. Colonial history had already shown that, here as elsewhere zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim and kill those they branded "heretics," "atheists" or "agnostics."[5] The First Amendment was therefore to insure that no one powerful sect or combination of sects could use political or governmental power to punish dissenters whom they could not convert to their faith. Now as then, it is only by wholly isolating the state from the religious sphere and compelling it to be completely neutral, that the freedom of each and every denomination and of all nonbelievers can be maintained. It is this neutrality the Court abandons today when it treats New York's coercive system as a program which *merely* "encourages religious instruction or cooperates with religious authorities." The abandonment is all the more dangerous to liberty because of the Court's legal exaltation of the orthodox and its derogation of unbelievers.

Under our system of religious freedom, people have gone to their religious sanctuaries not because they feared the law but because they loved their God. The choice of all has been as free as the choice of those who answered the call to worship moved only by the music of the old Sunday morning church bells. The spiritual mind of man has thus been free to believe, disbelieve, or doubt, without repression, great or small, by the heavy

courses in religious observance and education must be maintained and operated by or under the control of *duly constituted* religious bodies." (Emphasis added.) Art. 17, § 154, 1 N. Y. Official Code Comp. 683. This provides precisely the kind of censorship which we have said the Constitution forbids. *Cantwell* v. *Connecticut,* 310 U. S. 296, 305.

[5] Wertenbaker, The Puritan Oligarchy, 213–214.

hand of government. Statutes authorizing such repression have been stricken. Before today, our judicial opinions have refrained from drawing invidious distinctions between those who believe in no religion and those who do believe. The First Amendment has lost much if the religious follower and the atheist are no longer to be judicially regarded as entitled to equal justice under law.

State help to religion injects political and party prejudices into a holy field. It too often substitutes force for prayer, hate for love, and persecution for persuasion. Government should not be allowed, under cover of the soft euphemism of "co-operation," to steal into the sacred area of religious choice.

MR. JUSTICE FRANKFURTER, dissenting.

By way of emphasizing my agreement with MR. JUSTICE JACKSON's dissent, I add a few words.

The Court tells us that in the maintenance of its public schools, "[The State government] can close its doors or suspend its operations" so that its citizens may be free for religious devotions or instruction. If that were the issue, it would not rise to the dignity of a constitutional controversy. Of course, a State may provide that the classes in its schools shall be dismissed, for any reason, or no reason, on fixed days, or for special occasions. The essence of this case is that the school system did not "close its doors" and did not "suspend its operations." There is all the difference in the world between letting the children out of school and letting some of them out of school into religious classes. If every one is free to make what use he will of time wholly unconnected from schooling required by law—those who wish sectarian instruction devoting it to that purpose, those who have ethical instruction at home, to that, those who study music, to that—then of course there is no conflict with the Fourteenth Amendment.

The pith of the case is that formalized religious instruction is substituted for other school activity which those who do not participate in the released-time program are compelled to attend. The school system is very much in operation during this kind of released time. If its doors are closed, they are closed upon those students who do not attend the religious instruction, in order to keep them within the school. That is the very thing which raises the constitutional issue. It is not met by disregarding it. Failure to discuss this issue does not take it out of the case.

Again, the Court relies upon the absence from the record of evidence of coercion in the operation of the system. "If in fact coercion were used," according to the Court, "if it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented." Thus, "coercion" in the abstract is acknowledged to be fatal. But the Court disregards the fact that as the case comes to us, there could be no proof of coercion, for the appellants were not allowed to make proof of it. Appellants alleged that "The operation of the released time program has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction." This allegation—that coercion was in fact present and is inherent in the system, no matter what disavowals might be made in the operating regulations— was denied by appellees. Thus were drawn issues of fact which cannot be determined, on any conceivable view of judicial notice, by judges out of their own knowledge or experience. Appellants sought an opportunity to adduce evidence in support of these allegations at an appropriate trial. And though the courts below cited the concurring opinion in *McCollum* v. *Board of Education*, 333 U. S. 203, 226, to "emphasize the importance of de-

tailed analysis of the facts to which the Constitutional test of Separation is to be applied," they denied that opportunity on the ground that such proof was irrelevant to the issue of constitutionality. See 198 Misc. 631, 641, 99 N. Y. S. 2d 339, 348–349; 303 N. Y. 161, 174–175, 100 N. E. 2d 463, 469.[1]

When constitutional issues turn on facts, it is a strange procedure indeed not to permit the facts to be established. When such is the case, there are weighty considerations for us to require the State court to make its determination only after a thorough canvass of all the circumstances and not to bar them from consideration. Cf. *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543; *Hammond* v. *Schappi Bus Line,* 275 U. S. 164. If we are to decide this case on the present record, however, a strict adherence to the usage of courts in ruling on the sufficiency of pleadings would require us to take as admitted the facts pleaded in the appellants' complaint, including the fact of coercion, actual and inherent. See Judge Fuld, dissenting below, 303 N. Y., at 185, 100 N. E. 2d, at 475. Even on a more latitudinarian view, I cannot see how a finding that coercion was absent, deemed critical by this Court in sustaining the practice, can be made here, when appellants were prevented from making a timely showing of coercion because the courts below thought it irrelevant.

The result in the *McCollum* case, 333 U. S. 203, was based on principles that received unanimous acceptance by this Court, barring only a single vote. I agree with MR. JUSTICE BLACK that those principles are disregarded

---

[1] Issues that raise federal claims cannot be foreclosed by the State court treating the allegations as "conclusory in character." 303 N. Y. 161, 174, 100 N. E. 2d 463, 469. This is so even when a federal statute is involved. *Brown* v. *Western R. of Alabama,* 338 U. S. 294. *A fortiori* when the appeal is to the Constitution of the United States.

in reaching the result in this case.[2]   Happily they are not disavowed by the Court.   From this I draw the hope that in future variations of the problem which are bound to come here, these principles may again be honored in the observance.

The deeply divisive controversy aroused by the attempts to secure public school pupils for sectarian instruction would promptly end if the advocates of such instruction were content to have the school "close its doors or suspend its operations"—that is, dismiss classes in their entirety, without discrimination—instead of seeking to use the public schools as the instrument for securing attendance at denominational classes.   The unwillingness of the promoters of this movement to dispense with such use of the public schools betrays a surprising want of confidence in the inherent power of the various faiths to draw children to outside sectarian classes—an attitude that hardly reflects the faith of the greatest religious spirits.

MR. JUSTICE JACKSON, dissenting.

This released time program is founded upon a use of the State's power of coercion, which, for me, determines its unconstitutionality.   Stripped to its essentials, the plan has two stages: first, that the State compel each student to yield a large part of his time for public secu-

---

[2] The reservation made by four of the Justices in the *McCollum* case did not, of course, refer to the New York situation any more than it referred to that form of "released time" under which the whole student body is dismissed.   This was the reservation:

"We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as 'released time,' present situations differing in aspects that may well be constitutionally crucial.   Different forms which 'released time' has taken during more than thirty years of growth include programs which, like that before us, could not withstand the test of the Constitution; others may be found unexceptionable."   333 U. S., at 231.

lar education; and, second, that some of it be "released" to him on condition that he devote it to sectarian religious purposes.

No one suggests that the Constitution would permit the State directly to require this "released" time to be spent "under the control of a duly constituted religious body." This program accomplishes that forbidden result by indirection. If public education were taking so much of the pupils' time as to injure the public or the students' welfare by encroaching upon their religious opportunity, simply shortening everyone's school day would facilitate voluntary and optional attendance at Church classes. But that suggestion is rejected upon the ground that if they are made free many students will not go to the Church. Hence, they must be deprived of freedom for this period, with Church attendance put to them as one of the two permissible ways of using it.

The greater effectiveness of this system over voluntary attendance after school hours is due to the truant officer who, if the youngster fails to go to the Church school, dogs him back to the public schoolroom. Here schooling is more or less suspended during the "released time" so the nonreligious attendants will not forge ahead of the churchgoing absentees. But it serves as a temporary jail for a pupil who will not go to Church. It takes more subtlety of mind than I possess to deny that this is governmental constraint in support of religion. It is as unconstitutional, in my view, when exerted by indirection as when exercised forthrightly.

As one whose children, as a matter of free choice, have been sent to privately supported Church schools, I may challenge the Court's suggestion that opposition to this plan can only be antireligious, atheistic, or agnostic. My evangelistic brethren confuse an objection to compulsion with an objection to religion. It is possible to hold a faith with enough confidence to believe that what should be

rendered to God does not need to be decided and collected by Caesar.

The day that this country ceases to be free for irreligion it will cease to be free for religion—except for the sect that can win political power. The same epithetical jurisprudence used by the Court today to beat down those who oppose pressuring children into some religion can devise as good epithets tomorrow against those who object to pressuring them into a favored religion. And, after all, if we concede to the State power and wisdom to single out "duly constituted religious" bodies as exclusive alternatives for compulsory secular instruction, it would be logical to also uphold the power and wisdom to choose the true faith among those "duly constituted." We start down a rough road when we begin to mix compulsory public education with compulsory godliness.

A number of Justices just short of a majority of the majority that promulgates today's passionate dialectics joined in answering them in *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203. The distinction attempted between that case and this is trivial, almost to the point of cynicism, magnifying its nonessential details and disparaging compulsion which was the underlying reason for invalidity. A reading of the Court's opinion in that case along with its opinion in this case will show such difference of overtones and undertones as to make clear that the *McCollum* case has passed like a storm in a teacup. The wall which the Court was professing to erect between Church and State has become even more warped and twisted than I expected. Today's judgment will be more interesting to students of psychology and of the judicial processes than to students of constitutional law.