Dye, J. (dissenting).
The question posed on this appeal is whether the recital of a school-sponsored prayer may be required as a daily procedure in a public school. This question comes about as a result of a recommendation duly adopted at a special meeting of the Board of Education of Union Free School District Number Nine, New Hyde Park, New York, held July 8,1958, requiring that “ the regents prayer be said daily in our schools ”, pursuant to which the board gave a “ direction to the District Principal that this be instituted as a daily procedure to follow the salute to the flag ” (Minutes, Board of Educ., Union Free School, Dist. No. 9, of meeting July 8, 1958).
The Regents prayer is worded as follows: “ Almighty Glod, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country.” It derives from the “ Regents Statement on Moral and Spiritual Training in the Schools ”, issued by the New York State Board of Regents, as duly adopted at a meeting held on November 30, 1951. This statement was reaffirmed and supplemented. by *185 “ The Regents Recommendations for School Programs on America’s Moral & Spiritual Heritage ”, unanimously adopted March 25, 1955. The recommendations requoted the opening sentence of the 1951 statement, viz.: ‘ ‘ Belief in and dependence upon Almighty God was the very cornerstone upon which our Founding Fathers builded ”, and went on to express the conviction that “ such fundamental belief and dependence is the best security' against the dangers of these difficult days and the adoption of their recommendations the best way of insuring that this Government and our way of life shall not perish from the earth ”.
The Regents recommended that school programs be instituted, stressing the moral and spiritual heritage of America. It was in response to this recommendation that the respondent board promulgated the above order.
In the schools in the respondents’ district, it is the practice to say the prayer immediately after the salute to the flag, as a required daily procedure. It is led by the teacher or by a student selected by the teacher, with other students joining therein. While it does not appear whether any students leave the classroom during such recital, no penalty attaches for non-participation, since the board announced that, as a matter of policy, no child was to be required or encouraged to join in said prayer against his or her wishes.
The petitioners with one exception — a nonbeliever — are all members of various religious faiths and, as taxpayers and parents of children attending public schools within the district, have challenged the saying* of the prayer and have demanded its discontinuance on the ground that it amounts to an abridgement of religious freedom guaranteed by the First and Fourteenth Amendments to the Federal Constitution and section 3 of article I and section 4 of article XI of the New York State Constitution which, in essence, is to say that it constitutes a breach in Jefferson’s metaphorical wall “ separating church and state ”.
No one doubts for a moment that we are a religious people. It can be safely said that under no other government—past or present—have the people enjoyed such an untrammeled freedom to worship as they please and to indulge such freedom in more different ways and according to more diverse tenets *186 and beliefs than do the people of the United States. The number of sects and religious groups are almost countless, due, no doubt, to the varied origins of our heterogenous population who have come here seeking, among other things, an asylum from religious persecution and a freedom to gain salvation in their own chosen way. The recognition of the need for the spiritual comfort and solace derived from religious practices was a first concern of the Founding Fathers who gave it expression in the simple and plainly worded phrase: “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ”. (U. S. Const., 1st Arndt.) Our State Constitution reiterates the same thought as “ The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind ”. (N. Y. Const., art. I, § 3.)
The natural consequence of these fundamental principles is not only to allow but to guarantee to all citizens an absolute freedom in the exercise of religious belief or no belief. By the same token, our State is free to function without interference by or dictation from an organized church. This mutual forbearance in spirit and in practice has eliminated divisiveness in a most sensitive area, created mutual respect for both church and State and has unified our people in a way that no other force could do.
The development of the precise meaning of the establishment and freedom clauses of the First Amendment has had a long and interesting history which needs no narration here. Very recently the United States Supreme Court has dealt with it in a series of historical decisions which, though varying in details, make it clear that the establishment and freedom clauses of the First Amendment constitute a complete and unequivocal separation of church and State, a wall which £ £ must be kept high and impregnable ”, for in modern times it means at least this: ££ Neither a state nor the Federal G-overnment can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against bis will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church *187 attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.” (Everson v. Board of Educ., 330 U. S. 1, 15-16.) A year later, in McCollum v. Board of Educ. (333 U. S. 203, 210), involving a released time program in Illinois public schools, the United States Supreme Court found that the program, which in substance permitted outside teachers sponsored by religious organizations to give instruction in religion to school children, in the school building, during the school hours, as a substitute for the secular teaching provided in accordance with the compulsory education law, was “beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith ’ ’. This, as Mr. Justice Black took pains to point out (pp. 211-212), did not ‘ ‘ manifest a government hostility to religion or religious teaching. A manifestation of such hostility would be at war with our national tradition as embodied in the First Amendment’s guarantee of the free exercise of religion ’ ’, and the key to its meaning “ rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere ”. It is interesting to note that in McCollum the four dissenting Justices in Everson concurred. Mr. Justice Fbakkfueteb, while recognizing (p. 213) the existence of a clash in views as to “what the wall separates ’ ’, nonetheless made it very clear that the First and Fourteenth Amendments “ have a secular reach far more penetrating in the conduct of Government than merely to forbid an ‘ established church ’ ’ ’.
The New York released time program was tested and approved in Zorach v. Clauson (343 U. S. 306). This permitted release of public school students during class hours for religious instruction off the school grounds, provided that written parental approval was first obtained. All costs were paid by the interested religious organizations. Some have read Zorach as a retreat from McCollum, but a majority of the United States Supreme Court did not think so. In sustaining the program, *188 the court removed any possible doubt that the principle of “ complete and unequivocal ” separation enunciated in McCollum was being reaffirmed since “ the prohibition is absolute ” (p. 312). As the court expressed it, “ We follow the McCollum case ” (p. 315; italics supplied). In deciding the merits as they did, the United States Supreme Court took the view that New York was “ adjusting the schedule of public events to sectarian needs * * * [in the] best of our traditions ”, for to hold otherwise, in its opinion, ‘ ‘ would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. * * * The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here ” (p. 314).
It is also interesting to note that in McGowan v. Maryland (366 U. S. 420) Mr. Justice Douglas took occasion to sharpen what he had previously said in Zorach about our being a “ religious people ” by writing:
“ But those who fashioned the Constitution decided that if and when God is to be served, His service will not be motivated by coercive measures of government. * * * [The First Amendment] means, as I understand it, that if a religious leaven is to be worked into the affairs of our people, it is to be done by individuals and groups, not by the Government. * * * The idea, as I understand it, was to limit the power of government to act in religious matters (Board of Education v. Barnette, supra; McCollum v. Board of Education, 333 U. S. 203), not to limit the freedom of religious men to act religiously nor to restrict the freedom of atheists or agnostics.
“ The First Amendment commands government to have no interest in theology or ritual; * * * On matters of this kind government must be neutral.” (McGowan v. Maryland, 366 U. S. 420, 563-564, supra.)
Very recently McCollum (supra) was employed to strike down Maryland’s “ belief in God ” test for public office as an unconstitutional invasion of “ freedom of belief and religion” and, *189 accordingly, unenforcible (Torcaso v. Watkins, 367 U. S. 488, 495), the Supreme Court stating: “Neither [a State nor the Federal Government] can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs. ” It is clear, therefore, that the 1 ‘ establishment ’ ’ clause should not have the narrow application which a majority here would ascribe to it, and that it bars the action taken by the school board.
Running through the fabric of these definitive decisions, like the pattern of a tree of life in an intricate tapestry, is a clearly defined line of demarcation between church and State, which may not be overstepped in the slightest degree in favor of either the church or the State. In such light, a board of education may not require the saying of the Regents prayer as a daily school procedure. It is a form of State-sponsored religious education; in fact, according to the Regents, its purpose is “ teaching our children, as set forth in the Declaration of Independence, that Almighty God is their Creator ” (1951 Statement of Belief) and “ will give to the student an understanding and appreciation of his role as an individual endowed by his Creator * * * and of reverence for Almighty God.” It would thus “fulfill its [the school’s] high function of supplementing the training of the home” (Fundamental Beliefs, Regents Recommendations, adopted March 25, 1955). This requirement falls squarely within the categories of disability accounting for the decisions in Everson and McCollum (supra): use of public school classrooms during regular school hours, limitation of participation to those children whose parents consent and, in addition, being led by a teacher or by a person designated by the teacher. Under such announced purpose and method of performance, it cannot be less than instruction contrary to the establishment and freedom clauses, nor can the requirement be excused on the theory that the saying of the prayer—although conducted in the presence of the student body in the assembly hall of the classroom — is nonetheless a voluntary act, since no child is “ required or encouraged to join in said prayer against his or her wishes ” (Answering Affidavit), or on the theory that during the saying the child may remain silent, leave *190 the room or report late. This is no answer, for it contains the very elements the prayer is supposed to eliminate: divisiveness, a type of compulsion, exerting as it does a pressure which an immature child is unable to resist because of his inherent desire to conform, and constituting a subtle interference by the State with the religious freedom guaranteed by the First Amendment. As Mr. Justice Frankfurter so aptly phrased it: “ Separation means separation, not something less * # The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart.” (McCollum, supra, p. 231.)
The mere circumstance that the children of these petitioners may constitute a minority is no justification for rejecting their petition. The guarantees of the Bill of Bights, of which the First Amendment is the very cornerstone, were designed to protect minorities, which include diverse religious sects and atheists. While majority rule is an accepted incident of the political aspects of the democratic process, nothing in the Bill of Bights permits imposing the will of a majority — even in the slightest degree—upon an objecting minority, contrary to its protective cloak (Torcaso v. Watkins, supra; Board of Educ. v. Barnette, 319 U. S. 624). The very fact that the school board is charged with the duty of educating the young who are compelled to attend public school, except in certain instances not presently pertinent (Education Law , § 3212), is reason enough to observe scrupulously the establishment and freedom clauses here invoked. What was said in McCollum is appropriate here: “We renew our conviction that ‘ we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion.’ Everson v. Board of Education, 330 U. S. at 59. If nowhere else, in the relation between Church and State, ‘ good fences make good neighbors.’” (McCollum, supra, p. 232.)
The sponsors of the Begents prayer claim that it is nonsectarian in nature, a simple statement acknowledging the existence of and our dependence upon a Supreme Being; that such reference is of much the same character as the reference to God in *191 various holiday programs (i.e., Christmas, Easter, Thanksgiving Day), in various official oaths, in invocations and benedictions said at most public gatherings, at meetings of some official bodies as well as in the inscription of the motto “ In God We Trust ” on coins, stamps and bank notes. Although these references may well be regarded as a permissible illustration that we are a religious people (cf. Zorach v. Clauson, supra), it does not follow that the Regents prayer is beyond the reach of the First Amendment. Such an approach belies the avowed purpose of the Regents which, as we have pointed out, was to commence 1 £ teaching our children” (Statement of Belief). In our view, this conflicts with the establishment clause which, under the Fourteenth Amendment, applies to the State — and Boards of Education are not excepted (Board of Educ. v. Barnette, supra). While the Barnette case dealt with the punitive consequences of noncompliance, the United States Supreme Court again made it clear that ‘ ‘ If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein” (p. 642). The pledge of allegiance was neither designed nor intended for other than a patriotic purpose; yet, as applied to children who were expelled for refusal to comply because of religious scruples and whose absence thereby became unlawful, subjecting them and their parents or guardians to punishment was held unenforcible as to them. Under the Federal Constitution, it employed an impermissible means of achieving ‘ ‘ national unity ”. “ Compulsory unification of opinion”, as Mr. Justice Jackson in his illimitable forthrightness said (p. 641), “ achieves only the unanimity of the graveyard.” The inculcation of religion is a matter for the family and the church. In sponsoring a religious program, the State enters a field which it has been thought best to leave to the church alone. However salutary the underlying purpose of the requirement may be, it nonetheless gives to the State a direct supervision and influence that overstep the line marking the division between church and State and cannot help but lead to a gradual erosion of the mighty bulwark erected by the First Amendment. This does not mean that the State is or should be hostile to religion—merely that the State should *192 not invade an area where the constitutionally protected freedom is absolute and not open to the vicissitudes of legislative or judicial balancing.
The order appealed from should be reversed and the prayer of the petitioners should be granted, directing the Board of Education of Union Free School District Number Nine, New Hyde Park, to discontinue the saying of the Regents prayer in the schools within its district.
Judge Foster concurs with Chief Judge Desmond ; Judge Froessel concurs in an opinion in which Judge Van Voorhis concurs; Judge Burke concurs in a separate opinion; Judge Dye dissents and votes to reverse in an opinion in which Judge Fuld concurs.
Order affirmed.