In the Matter of Steven I. Engel et al., Appellants, *v.* William J. Vitale, Jr., et al., Constituting the Board of Education of Union Free School District Number Nine, New Hyde Park, Respondents, and Henry Hollenberg et al., Intervenors-Respondents.

Second Department, October 17, 1960.

*William J. Butler* (*Stanley Geller* and *Peter B. Schwartzkopf* of counsel), for appellants.

*Bertram B. Daiker* (*Wilford E. Neier* of counsel), for Board of Education, respondent.

*Porter R. Chandler* (*Thomas J. Ford* and *Richard E. Nolan* of counsel), for intervenors-respondents.

*Charles A. Brind* (*John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* of counsel), for Board of Regents of the University of the State of New York, *amicus curiæ.*

*Per Curiam.* The purpose of this article 78 proceeding is to compel the local school board to discontinue its practice of requiring daily recitation in the schools of the "Regents' Prayer", which reads as follows: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our country."

The Justice at Special Term, in a comprehensive opinion (*Matter of Engel* v. *Vitale,* 18 Misc 2d 659), held that the pleadings do not raise a triable issue as to any material fact. He denied the petition as a matter of discretion; and he remanded the matter to the school board for further proceedings consistent with his opinion.

The further proceedings relate to the adoption of certain safeguards intended to eliminate any element of coercion or compulsion upon the student with respect to the daily recitation of the prayer.

We agree with the views expressed in the opinion of the learned Justice at Special Term.

Hence, the order insofar as appealed from should be affirmed, without costs, upon said opinion.

BELDOCK, J. (concurring in part and dissenting in part). While I agree that the decretal provisions of the order should be affirmed, I disagree as to the grounds stated by the Justice at Special Term for his determination, and I disagree as to the nature of the further proceedings suggested by him in his opinion.

In my opinion the order should be affirmed, not upon the grounds stated by said Justice, but solely on the grounds that the voluntary recital of the prayer is not an act of religious training or teaching; that under proper safeguards against compulsion it is permissible; and that it violates neither the First Amendment to the Federal Constitution nor decisional law.

It is also my opinion that the order should be modified so as to remand the proceeding to the local Board of Education for further action consistent with my views as hereinafter expressed.

The question to be decided is whether an order of the local Board of Education directing the recitation of a prayer in the public schools at the opening of each school day, following the salute to the flag, violates the Federal and State constitutional guarantees of religious freedom, even though such order be amended and administered so as to make the recitation optional with each student.

The prayer, known as the " Regents' Prayer ", is sponsored by the Board of Regents of the State of New York. It contains 22 words; requires less than one minute to recite; is not accompanied by any comment; and reads as follows: " Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our country." The recitation is led either by the teacher or by a student designated by the teacher, with the other class students repeating the prayer.

The First Amendment to the Federal Constitution forbids the making of laws " respecting an establishment of religion, or prohibiting the free exercise thereof ". The State Constitution (N. Y. Const., art. I, § 3) provides that the " free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind ".

The question as to whether a school board's order requiring the teacher, within the classroom, to cause a prayer to the Almighty to be recited, violates the First Amendment to the Federal Constitution and corresponding provisions of the State Constitution (as well as the question of selected Bible reading in the classroom), has been the subject of considerable controversy in this country for more than a century. The question is of grave concern to all. The judicial pronouncements thereon are in conflict.

I have no doubt that the *compulsory* recitation of a prayer in the classroom violates the constitutional provisions. I have concluded, however, that the prayer here involved (which I agree is nonsectarian and nondenominational), does not constitute religious teaching and, if voluntary and circumscribed by proper safeguards, does not violate the constitutional proscription of laws " respecting an establishment of religion ". Nor do I find the prayer to be in conflict with recent decisional law on the related subject of teaching sectarian religion during the " released time " period.

From the point of view of policy I fully subscribe to the statement of principle in the Regents' Statement of Moral and Spiritual Training in the Schools, adopted November 30, 1951, to wit: " Belief in and dependence upon Almighty God was the very cornerstone upon which our Founding Fathers builded." It cannot be gainsaid that, above all things, it is essential for our children to be exposed to programs which emphasize the moral and spiritual heritage which is America's and to be inspired by the examples of their ancestors toward a greater respect for lawful authority, for love of God and respect for parents and home. However, we are not now dealing with a matter of policy, but with one of power.

The basic issue here deals with the power of the school board to *direct* the recital of this prayer *on* school premises *under the supervision of the school teachers*. It is not disputed by the litigants that the prayer is of a religious nature. The main dispute is as to whether it is religious instruction and whether it is said by the students under compulsion.

The Justice at Special Term pointed out that (18 Misc 2d 659, 672) " the State's interest in familiarizing students with the religious nature of our heritage would not justify the use of prayer as a vehicle for imparting that knowledge since there are other equally effective and constitutionally uninhibited means of achieving that end."

The Justice at Special Term also declared (p. 673) that if the purpose is to inculcate in the students a love of God, then " as an exercise required of all pupils, it would constitute religious instruction in violation of the ' establishment ' clause ", and as a permissive exercise, unless participating children were free " to adopt any posture, use any gesture, wear any attire, use any language, or follow any other practice which his or her own religious beliefs may dictate ", it would " violate the ' free exercise ' clause of the Federal and State Constitutions, as well as the parent's rights   *   *   *   under the due process clause to control the education of his child."

The Justice at Special Term sustained the validity of the prayer and the power of the school board to direct it. He based his conclusion upon the theory that prayer in the schools is permissible " not as a means of teaching ' spiritual values ' but because traditionally, and particularly at the time of the adoption of the First and Fourteenth Amendments, *this was the accepted practice.*" (Italics supplied.) (*Matter of Engel* v. *Vitale,* 18 Misc 2d 659, 673, *supra.*) Apparently, therefore, the basis of his conclusion is that at the time of the amendments it was the accepted practice to utilize prayer in the public schools and, hence, it is proper to resort to prayer today.

While I agree with the final conclusion reached by the learned Justice at Special Term, I am in total disagreement with his reasons therefor, and particularly with the " accepted practice " theory.

My sole reason for sustaining the " Regents' Prayer " is that, in my opinion, the prayer here involved *does not constitute religious teaching.* The recital of this prayer does nothing more than acknowledge the existence of God and dependence upon him. It gives no training or instruction of any religious nature whatever. There can be no constitutional objection to a prayer which is said without rites or ceremony or doctrinal teaching, and which serves at the beginning of each day to give each student who believes in God " a brief moment with eternity " and a feeling of " humility before the Supreme Power " (*Doremus* v. *Board of Educ.,* 5 N. J. 435, 452, appeal dismissed 342 U. S. 429). Such a prayer merely affirms and reaffirms " that this is a religious nation "; it recognizes (as do the Federal Constitution, every State Constitution and every colonial grant and charter beginning with the one to Christopher Columbus) " a profound reverence for religion and an assumption that its influence in all human affairs is essential to the well being of the community " (*Holy Trinity Church* v. *United States,* 143 U. S. 457, 468, 470).

I agree fully with the following statements made by the Supreme Court of New Jersey in the *Doremus* case (*supra,* pp. 439–440, 453):

" Was it the intent of the First Amendment that the existence of a Supreme Being should be negated and that the governmental recognition of God should be suppressed? Not that, surely  *  *  *.

"Instances could be multiplied going to the undeniable result that the Constitution itself assumes as an unquestioned fact the existence and authority of God and that  *  *  * all branches of the government followed a course of official conduct which openly accepts the existence of God as Creator and Ruler of the Universe  *  *  *.

" The fact is that the First Amendment does not say, and so far as we are able to determine was not intended to say, that God shall not be acknowledged by our government as God. Our view is that a prohibition which is not in the language of the amendment and which is contrary to the intention of those who framed and adopted the instrument should not now be read into it."

While the authorities are in conflict, the general or prevailing rule, supported by the weight of authority, appears to be that the recitation of an undenominational prayer without comment (and particularly an informal prayer), is not prohibited by the constitutional provisions, either State or Federal, provided: (1) participation by the student in such recitation is not compulsory; (2) such recitation merely tends " to inculcate fundamental morality " in the students; and (3) it is not " carried so far as to emphasize the teaching of a particular sect " or of any particular religious doctrine (Ann. 141 A. L. R. 1144, 5 A. L. R. 866, 45 A. L. R. 2d 742; 47 Am. Jur., Schools, § 210, and cases there cited; *Lewis* v. *Board of Educ. of City of N. Y.,* 157 Misc. 520, 528–530, mod. on other grounds 247 App. Div. 106, appeal dismissed 276 N. Y. 490; *Doremus* v. *Board of Educ.,* 5 N. J. 435, appeal dismissed 342 U. S. 429, *supra*; contra: *Schempp* v. *School Dist. of Abington Township,* 177 F. Supp. 398, 404–407).

In my opinion, the prayer here is not said pursuant to any law or order " respecting an establishment of religion " (U. S. Const., 1st Amdt.). It is said pursuant to an order which authorizes, as prescribed by both the State and Federal Constitutions, the " free exercise " and enjoyment of religious profession and worship, without discrimination or preference. As to those who believe in God, the prayer constitutes simply a " pledge of allegiance " to Him and an invocation of His divine

blessing. In other words, it is a voluntary confession of faith in the exercise of the religious freedom guaranteed to every individual by the State and Federal Constitutions. Accordingly, it does not partake in the slightest degree of religious training or religious teaching.

In a recent case (*Matter of Lewis* v. *Allen,* 5 Misc 2d 68, 73, *supra*) in which an attack was was made upon the inclusion of the words " under God " in the pledge of allegiance to the flag, Mr. Justice BOOKSTEIN at Special Term, Albany County, made these statements, which are quite apropos: " If petitioners' contention be sound, it may be wondered whether the public school curriculum might properly include the Declaration of Independence and the Gettysburg Address. Could ' America ' (' Protect us by thy might, Great God, our King! ') be sung in a public school without offending the First Amendment? And might not the presidential oath of office have questionable constitutional status? "

The contention that acknowledgments of and references to Almighty God are acceptable and desirable in all other phases of our public life but not *in our public schools* is, in my judgment, an attempt to stretch far beyond its breaking point the principle of separation of church and State and to obscure one's vision to the universally accepted tradition that ours is a Nation founded and nurtured upon belief in God.

In the most recent pronouncement by the United States Supreme Court which dealt with the " released time " program in our public schools (*Zorach* v. *Clauson,* 343 U. S. 306), the court gave to the Nation these basic principles for its guidance (pp. 312–314):

" There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment. See *Everson* v. *Board of Education,* 330 U. S. 1; *McCollum* v. *Board of Education, supra.* There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And \* \* \* the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. *The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State.* Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other — hostile, suspicious, and even unfriendly. \* \* \* Prayers in our

legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; ' so help me God ' in our courtroom oaths — these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: ' God save the United States and this Honorable Court.' (Italics supplied.)   *   *   *

" We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here."

The prayer here under attack is indeed a part of man's immemorial, inseparable and absolute right to declare his faith and to acknowledge and place his trust in God. The constitutional provisions are intended to protect and to perpetuate this right in man and never to deprive him of it or to discriminate against it. And, in furtherance of such protection, the State

must scrupulously observe a strict neutrality; it may not favor or disfavor the believer over the nonbeliever or one sect over another (cf. *Everson* v. *Board of Educ.*, 330 U. S. 1, 18, 64; *Matter of Zorach* v. *Clauson*, 303 N. Y. 161, 170, 180–183, affd. 343 U. S. 306, 311–315, *supra*).

Of course, the "man of no religion has a right to act in accordance with his lack of religion" but he has "no right to insist that others shall have no religion" (*Reichwald* v. *Catholic Bishop of Chicago*, 258 Ill. 44, 48), particularly since, as stated, from the very inception of this country we have been essentially "a religious people whose institutions presuppose a Supreme Being" (*Zorach* v. *Clauson*, 343 U. S. 306, 313, *supra*; cf. *Holy Trinity Church* v. *United States*, 143 U. S. 457, 465–470, *supra*). The right to disbelieve as well as to believe is guaranteed by the First Amendment, and the disbeliever may therefore refrain from engaging in prayer. But the amendment affords the disbeliever "no preference over those who do believe in God and who * * * choose to express that belief" (*Matter of Lewis* v. *Allen*, 5 Misc 2d 68, 75, *supra*).

As pointed out by Judge DESMOND in his concurring opinion in the *Zorach* case (*supra*, pp. 181–183), it "is inconceivable" that the First Amendment to the Federal Constitution "was ever meant to prohibit governmental encouragement of, or cooperation with, religions generally" because "ours is a religious nation" and because such aid and encouragement, "as distinguished from establishment or support of separate sects, has never been considered offensive to the American constitutional system."

Here, when the local school board authorizes the prayer to be said at the opening of the school day by all those *desiring* to participate, it does no more than to postpone the period of the secular instruction for the minute or less required for the prayer or acknowledgment of religious faith. In my opinion such an accommodation of the secular education to the voluntary prayer or confession of religious faith directed by this local Board of Education, is not religious teaching or religious instruction. It is a proper and commendable practice which is in keeping with the best traditions of this Country and with the relevant provisions of the State and Federal Constitutions (cf. *Matter of Zorach* v. *Clauson*, 303 N. Y. 161, 170, 180–183, *supra*; *Zorach* v. *Clauson*, 343 U. S. 306, 311–315, *supra*; *Matter of Lewis* v. *Allen*, 5 Misc 2d 68, *supra*; *64th St. Residences* v. *City of New York*, 10 Misc 2d 841, 845–847; *Baer* v. *Kolmorgen*, 14 Misc 2d 955, 957; *Baer* v. *Kolmorgen*, 14 Misc 2d 1015, 1016–1017, 1021–1022).

I now come to the contention as to the compulsory nature of the prayer. It is claimed that subtle pressure is created by reason of the necessity for the parent and the child to request that the child be excused from participation, and that such pressure *compels* participation in the prayer. In remanding the matter to the Board of Education, the Justice at Special Term has left the procedure to be adopted entirely to the board's wisdom.

However, the said Justice in his opinion expressed his own views as to some of the methods to be employed to eliminate the elements of coercion and " subtle " pressure. In doing so he has recommended, among other things: (1) that the child to be excused may arrive " later " or appear in class after the recital of the prayer; (2) that the prayer may be said in " common assembly " and the excused child sent to another room; and (3) that there shall be no comment made with respect to the excused child or any requirement imposed on him as to his posture or attire (similar to the practice adopted by the New York City Board of Education in its operation of the released time program).

I fully agree with the last recommendation with respect to the omission of any comment and of any requirement as to posture and attire. I disagree, however, with respect to the other stated recommendations.

It is my opinion that the choice of action to be followed should not be left to the Board of Education to be *mandated* upon the parent; but that the *free choice* of the *alternative procedures* should be *left to the parent* pursuant to a formula to be adopted by the board after thorough discussion and consultation with all interested **groups.**

I disapprove of the recommendation that the prayer be said in common assembly and the excused child be sent to another room. In such proposed practice I see a potential pressure which, as to some students, may rise to the level of compulsion or coercion, and which as to many students may result in a schism and divisiveness.

I likewise disapprove of the recommendation that the excused child may report " late ". I believe that the basic discipline of any school requires a uniform time of commencement for all students in the same grades or classes.

My own preference is that the prayer be one not mandated and required to be repeated or recited verbatim by all in attendance in the room, pursuant to the order of the school board. I would suggest that the recitation of the prayer be put on a voluntary basis and that it be conducted in a manner similar to

that of an invocation or benediction by a priest, minister, rabbi, or layman at public or private functions attended by men of all faiths, namely: that the prayer be recited by the teacher or by a student designated by the teacher; that the other students in the class be invited (not directed) to join in the prayer if they so desire by repeating it aloud or *sotto voce* or by silent meditation, and that all those present who elect not to join may refrain from participating and remain quiet. In other words, even though those present in the classroom may include all the unexcused students only, nevertheless there should be no requirement for the students to repeat the prayer *aloud*. Each student should be free to do so or to remain silent, according to his own conscience and his parental instruction.

It may well be that, despite all the practicable safeguards taken, some vestige of compulsion due to embarrassment may still remain, because when one abstains " it sets him apart as a dissenter, which is humiliating " (*McCollum v. Board of Educ.*, 333 U. S. 203, 232). Such embarrassment, however, is the inevitable consequence of dissent; it is the price which every nonconformist must pay. But, as pointed out by Mr. Justice JACKSON in the *McCollum* case (p. 233): " Even admitting this to be true, it may be doubted whether the Constitution which, of course, protects the right to dissent, can be construed also to protect one from the embarrassment that always attends nonconformity, whether in religion, politics, behavior or dress. Since no legal compulsion is applied to * * * [the dissenting student] and no penalty is imposed or threatened from which we may relieve him, we can hardly base jurisdiction [to intervene and stop the practice] on this ground."

In conclusion, it is suggested that in the formulation of its procedures on the remand, the school board may well use as a guide the classic statement made in *1839* by the then New York State Superintendent of Schools, Mr. Spencer. He said: " ' Both parties have rights; the one to bring up their children in the practice of publicly thanking their Creator for His protection, and invoking His blessing; the other of declining in behalf of their children, the religious services of any person in whose creed they may not concur, or for other reasons satisfactory to themselves. These rights are reciprocal, and should be protected equally; and neither should interfere with the other. Those who desire that their children should engage in public prayer have no right to compel other children to unite in the exercise, against the wishes of their parents. Nor have those who object to this time, place or manner of praying, or to the person who conducts the exercises, a right to deprive the

other class of the opportunity of habituating their children to what they conceive an imperious duty. Neither the common school system, nor any other social system, can be maintained, unless the conscientious views of all are equally respected. The simple rule, so to exercise your own rights as not to infringe on those of others, will preserve equal justice among all, promote harmony, and insure success to our schools.' " (*Matter of Engel v. Vitale*, 18 Misc 2d 659, 661–662, *supra*.)

This statement of Superintendent Spencer is as valid today as it was when made. It summarizes, perhaps better than elsewhere, the respective legal rights of the believer and the nonbeliever and the best means of preserving such rights in relation to prayer in the classroom.

It is my opinion that the " Regents' Prayer " may be validly integrated into the curricula of the public schools, provided that participation in such daily prayer is made optional with each student in accordance with the safeguards here suggested.

NOLAN, P. J., CHRIST, PETTE and BRENNAN, JJ., concur in *Per Curiam* opinion; BELDOCK, J., concurs in part and dissents in part, in opinion.

Order insofar as appealed from affirmed, without costs, upon the opinion of the Special Term.