CHAMBERLIN, et al v. DADE COUNTY SCHOOL BOARD, et al.
Nos. 59 C 4928, 59 C 8873.

Circuit Court, Dade County.

April 15 and May 10, 1961.

Bernard S. Mandler, Miami Beach, for plaintiff Chamberlin.

Howard W. Dixon, Miami, for plaintiff Resnick.

George C. Bolles, Jr., Miami, for defendant school board.

E. F. P. Brigham, Miami, for David Hume, et al, intervening defendants.

J. FRITZ GORDON, Circuit Judge.

*Opinion, April 15, 1961:* These are two cases which have been consolidated for the purpose of trial of the issues, the issues being somewhat similar in their allegations and the prayers for relief. The gist of the allegations in both complaints follows —

That under Florida law children are required to attend school. Section 231.01, Florida Statutes —

> All children, except those who become or have become married, unmarried students who are pregnant, and students who have already had a child outside of wedlock, who have attained the age of seven years or who will have attained the age of seven years by February 1 of any school year or who are older than seven years of age but who have not attained the age of sixteen years are required to attend school regularly during the entire school term . . .

That under another section of the statutes a penalty is provided for the failure of children to attend. Section 232.09 —

> Each parent of a child within the compulsory attendance age shall be responsible for such child's school attendance as required under the provisions of §§232.01-232.19. The absence of a child from school shall be prima facie evidence of a violation of this section; provided, that no parent of a child shall be held responsible for such child's nonattendance at school under any of the following conditions:
>
> (1) WITH PERMISSION.—The absence was with permission of the head of the school; or
>
> (2) WITHOUT KNOWLEDGE OR UNABLE TO CONTROL.—The absence was without the parent's knowledge, consent, or connivance; or that he or she has made a bona fide and diligent effort to control and keep the child in school and that he or she is unable to do so; in which cases the child shall be dealt with as a delinquent; or
>
> (3) FINANCIAL INABILITY.—That he or she was unable financially to provide necessary clothes for the child, which inability was reported in writing to the county superintendent prior to the opening of school or immediately after the beginning of such inability; provided, that the validity of any claim for exemption under this subsection shall be determined by the county superintendent subject to appeal to the county board; or
>
> (4) SICKNESS, INJURY, OR OTHER INSURMOUNTABLE CONDITION.—That attendance was impracticable or inadvisable on account of sickness or injury, attested to by a written statement of a licensed practicing physician, or was impracticable because of some other stated insurmountable condition as defined by regulations of the state board; or
>
> (5) DISTANCE EXEMPTION.—That attendance was impossible because of the distance of the home of the child from the nearest school and the lack of transportation at public expense, as set forth in §232.06.

That the children of the plaintiffs and the children of other parents in like situations attend the public schools of Dade County, which are under the supervision and control of the defendant school board, citing the following sections of the statutes —

*230.01 County unit.*—Each county shall constitute a unit for the control, organization, and administration of schools.

*230.02 Scope of county system.*—A county school system shall include all public schools, classes, and courses of instruction and all services and activities directly related to education in that county which are under the direction of the county school officials.

*230.03 Control; organization, administration, and supervision.*—The county school system shall be controlled, organized, administered and supervised as follows:

(1) COUNTY SYSTEM.—The county school system shall be considered as a part of the state system of public education. All actions of county school officials shall be consistent and in harmony with state laws and with rules and regulations and minimum standards of the state board. County school officials, however, shall have the authority to provide additional educational opportunities, as desired, which are authorized but not required by law.

(2) COUNTY BOARD.—Responsibilty for the organization and control of the public schools of the county shall be vested in the county board, as provided in §§230.04-230.23.

(3) COUNTY SUPERINTENDENT.—Responsibility for the administration of the schools and for the supervision of instruction in the county shall be vested in the county superintendent as the secretary and executive officer of the county board, as set forth in §§230.24-230.33.

(4) TRUSTEES.—The school district trustees shall constitute an advisory body for the district as set forth in §§230.34-230.43.

(5) PRINCIPAL OR HEAD OF SCHOOL.—Limited responsibility for the administration of any school or schools at a given school center and for the supervision of instruction therein shall be delegated to the principal or head of the school or schools as hereinafter set forth.

That their children while attending school are subjected to "religious and sectarian practices and instruction" (pp. 2-4, case no. 59 C 4928, Harlow Chamberlin) which are listed as follows —

*Bible practices*—(a) The regular reading of verses from the Holy Bible in assemblies and classrooms; (b) explanation, comments and expansion by teachers on verses of the Holy Bible so read; (c) the distribution of the Holy Bible and other religious and sectarian literature among the children attending the public schools; and (d) the use of public school facilities for Bible instruction after school hours.

*Prayers and grace*—The regular recitation of (a) the Lord's Prayer; (b) other religious and sectarian prayers; and (c) grace.

*Religious hymns*—The regular singing of religious and sectarian hymns at assemblies and within classrooms.

*Religious holiday observances*—The observance of the Christmas holiday through sectarian programs including Nativity plays, pageants and scenes as well as instruction in the dogma of the Nativity; (b) the observance of the Easter holiday through sectarian programs including Resurrection plays, pageants and scenes as well as instruction in the dogma of the Resurrection; (c) the observance of Hanukkah, including the lighting of the candles, and the observance of Passover.

*Religious symbols*—The placing of religious and sectarian symbols in the assembly rooms, classrooms and other parts of the public school premises.

*Baccalaureate program*—The conducting of religious and sectarian baccalaureate programs.

*Religious census*—The conducting of a religious census among the children to ascertain their own religious affiliations and the religious affiliations of their parents.

*Religious test for teachers*—The imposition of a religious test for teachers and other employees of the public school system as well as the use of religious criteria in the employment and evaluation of teachers and other employees of the public school system.

That such acts are violative of their federal and state constitutional rights as follows —

First Amendment, Federal Constitution —

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Fourteenth Amendment, Federal Constitution —

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Declaration of Rights, Florida Constitution —

Section 6. No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution.

The defendant Dade County Board of Public Instruction in its answer alleges that the school board after many years of operating under an unwritten rule adopted the following rule described as "Resolution No. 60-21 . . . Regarding Bible Reading" —

WHEREAS, Section 231.09 (2), Florida Statutes, provides:

*"Duties of instructional personnel —*

(2) *Bible Reading* — Have, once every school day, readings in the presence of the pupils from the Holy Bible, without sectarian comment." and

WHEREAS, the principals of the various schools have, for many years, been instructed to release any child from participating in the daily reading of the Bible if request for his release has been made by his parent. or guardian; and

1. That the Bible be read daily without sectarian comment in each of the schools in the Dade County School System.

2. Any pupil shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian.

3. That if any non-academic activity in the schools be deemed by a parent or guardian to be violative of the religious conscience of such parent or guardian of any child in the public school system, that such parent or guardian shall have the right to request the release of his child from participating therein, and the various principals shall grant such request, making proper provision for the orderly care of such released children.

PASSED AND ADOPTED this 29th day of June, 1960.

The school board admitted certain of the practices complained of but denied such practices were violative of any constitutional rights of the plaintiffs and denied other of the allegations in the complaint. Several persons were permitted to intervene claiming they and persons alike situated had an interest in the cause. Much testimony was taken over a long period of time and the court makes the following findings of fact —

That upon school being opened in the morning and the classes convened, a three to five minute period is utilized during which time a devotional is read, which usually is the reading of a verse from the Old Testament or the New Testament of the Holy Bible, a pledge of allegiance to the Flag of our Country is given and the Lord's Prayer is said.

The court finds from the testimony that on one occasion comment was made by a person about a verse read from the Bible, but that this was an isolated incident and was forbidden by law. This comment was not made by the teacher and the court finds that this is not the general practice in the classroom.

The court finds that under a policy of the school board, Holy Bibles or the official Holy Book of any other religious sect may be given to seventh grade pupils on a strictly voluntary basis and that the principals and teachers may conduct this distribution without sectarian comment on the school premises, but finds that none have been distributed, under this rule, for a period of five years.

There was testimony from Mrs. Resnick, wife of one of the plaintiffs, who said she saw a book for distribution, which has been introduced in evidence as "Resnicks' exhibit no. 1," but the evidence offered by the defendant is so persuasive that the testimony of Mrs. Resnick standing alone cannot be said to prove that such has been shown to be conclusive evidence.

The court finds that the Lord's Prayer is said, sometimes in unison by the pupils, during the three to five minute time at the opening of school. That other prayers are said, but no definite prayer other than the Lord's Prayer has been sufficiently set out for the court to pass on the words used in such other prayer or prayers.

The court finds also that no conclusive and definite proof has been offered to substantiate that grace is said in the schools.

The court finds also that programs are held on Christmas depicting the Nativity scenes and Hanukkah celebration, such as the lighting of the candles. That at Easter, programs are held depicting the death of Christ on the Cross and the Resurrection.

The court further finds that children may be excused from attending these programs, although testimony was given that in some instances the request to be excused was denied by the teacher, when requested by the student and not the parent, but further testimony revealed that the teacher was not apprised of the school board regulations or did not know of the passage of rule 60-21.

The court also finds that from time to time hymns are sung on school premises, such as "Hark, the Herald Angels Sing," "O, Little Town of Bethlehem," "Deck the Halls with Boughs of Holly," as well as "Silent Night," "Jingle Bells" and "White Christmas."

That religious symbols such as the Cross, Nativity scenes and the Star of David have been displayed in the schools at or about the time of Christmas and Easter. That such were usually prepared by the children. On one occasion a gift to the school of a picture of Christ was displayed in a school.

The court finds in regard to baccalaureate programs that they are held at times off school premises at which time a minister, priest or rabbi is invited to address the assembled students. That attendance of the student is optional and that such programs are not held during school hours.

The court finds as to religious census of students that on a few occasions some students have been asked about their religious preference but it is the court's finding that such is not a general occurrence nor is it required or requested by the school board.

As to religious tests for teachers, the court finds that on the application for positions as teachers there is a question to be answered, "Do you believe in God?", but that there are no religious tests imposed upon teachers. The court further finds no evidence of religious criteria and evaluation of teachers or other employees of the school system.

As to Bible reading in the schools, counsel seem to rely on the holdings in People, ex rel. McCollum v. Board of Education (1948), 333 U. S. 203, 68 S. Ct. 461, as a precedent for a ruling in this case. A careful analysis of the holding in the McCollum case reveals that the facts involved "the use of tax supported property for religious instruction." In the instant case, we do not have the problem of "religious instruction"—but rather the reading of a verse from the Holy Bible having in it expressions or wording that we all use every day, such as "Thou shalt not kill" even though it might be used in a different form. In almost every creed, religion or belief, the words of the Golden Rule are a way of life by which we should live if we are to exist peaceably.

This is not a Godless nation of people. Justice Douglas, in a decision of March, 1952, said—"We are a religious people whose institutions presuppose a Supreme Being." In 1948, Justice Jackson wrote—"One can hardly respect a system of education which should leave the student wholly ignorant of the currents of religious thought that move the world society . . . for a part in which he is being prepared." When the liberty bell was cast, it had inscribed on it the words of Moses—"Proclaim liberty throughout the land unto all inhabitants thereof." Lev. 25.10. In our Declaration of Independence, there are four specific references to the dependence of our nation on Almighty God— " . . . the laws of nature and of natures God entitle them . . . "; " . . . all men . . . endowed by their Creator with certain inalienable rights . . . "; " . . . to the Supreme Judge of the world . . ."; " . . . with a firm reliance on the protection of Divine Providence . . . " On our coin of the realm is inscribed — "In God We Trust." Congress approved a design of the dollar bill on June 20, 1782, which has the

"Eye of God" above the pyramid over which are the words "Annuit Coeptis" which signifies — "He [God] has favored our undertakings." The oath taken by government employees, witnesses in court and others conclude with the words—"So help me God." On April 20, 1953 a resolution was introduced in the House of Representatives to add the words "under God" to the pledge of allegiance, which passed the Congress and was signed into law by President Eisenhower on June 14, 1954. Our presidents of the United States, from the first to the last, have invoked the guidance of a Supreme Being in their inaugural address — "God helping me I will not fail," "I ask the help of Almighty God in this service to my country," "we humbly ask the blessing of God . . . ," and "may He guide me in the days to come." A joint resolution was adopted by Congress on July 20, 1956, establishing as the national motto of the United States the words—"In God We Trust." These few references are cited, among the many, to indicate that not only the people of this great nation but its leaders and the government, itself, is committed to a belief in a Supreme Being.

How then can we ignore the words of Justice Jackson cited above? — "One can hardly respect a system of education which should leave the student wholly ignorant of the currents of religious thought that move the world society . . . for a part in which he is being prepared."

We shall now turn to the language used by our United States Supreme Court for help. In the Minersville School District v. Gobitis, 310 U.S. 586, 60 S.C. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, the court said — "The question remains whether school children, like the Gobitis children, must be excused from conduct required of all the other children in the promotion of national cohesion." The facts were that the Gobitis children were expelled from school for their refusal to salute the flag of our country because the gesture required during the salute "was forbidden by command of scripture." One will notice that the salute with its gestures was required and expulsion followed because of the refusal. Nothing could be more compulsory. Again quoting from the court's opinion — "That the flag salute is an allowable portion of a school program for those who do not invoke conscientious scruples is surely not debatable." This would seem to indicate that if a dissident was excused or had the right to be excused, then the program was constitutional.

Let us turn to the latest Supreme Court case, at this time, Zorach v. Clauson, 343 U.S. 306, 72 S.C. 679, 96 L.Ed. 954, to review the facts —

New York City has a program which permits its public schools to release students during the school day so that they may leave the school buildings and school grounds and go to religious centers for religious instruction or devotional exercises, a student is released on written request of his parents. Those not released stay in the class rooms.

While the facts in the Zorach case as the United States Supreme Court pointed out are not the same as in the McCollum case, because in our case the school property was used for the program complained of, some of the language used by the Supreme Court in the Zorach case may be of help —

We are a religious people whose institutions pre-suppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person. But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence. The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here.

From the words above used, can it be said that the use of a school room for the reading of a verse from the Bible, the saying of the Lord's Prayer and salute to the flag, from which program a student may be excused by request, is violative of the constitutional rights of the plaintiffs here? I do not believe so; however, no definite ruling has been made by the United States Supreme Court on Bible reading or prayer in the public schools, that court having twice refused to hear appeals from state decisions.

It is evident that after the passage of the resolution by the school board, in the instant case, setting forth the method of requesting that a student be excused from the program where a verse from the Bible is read, that no employee of the school board, teacher or otherwise, can use coercion on any student to attend the program or to stay away from the program.

Let us now turn to rulings by various state courts for enlightenment. In People, ex rel. Vollmar v. Stanley (1927), 81 Colo. 276, 255 P. 610, the Supreme Court of Colorado had before it a mandamus action which sought to compel the school board to — "revoke their rule requiring the reading of the Bible as a portion of the morning exercise in the schools in which petitioner's children are in attendance and prohibit such religious exercises in the public schools of said school district." The wording of the Colorado constitutional provision is almost the same as Florida's provision under section 6 — "nor shall any preference be given by law to any religious denomination or mode of worship." The court there held that the Bible was not sectarian and that Bible reading in the school room where a student was not required to attend was not violative of the constitutional rights of the petitioners and said —

> It is claimed . . . that the rule in question denies to petitioner's children the free enjoyment of their religion and discriminates against them because of their religion; but, if they need not attend how can that be so? They still exercise their religion as they please, and are neither deprived of anything nor are required to do anything on account thereof.

> It is argued that because some sects regard the Bible as sacred and inspired and others not, it is therefore sectarian. Non sequitur. Sectarian or not cannot be determined of a book by how sects regard it. The decisive question is whether it teaches some doctrine peculiar to a sect. That part which does not is not sectarian. The eloquence of Amos and Isaiah and the wisdom of the parables is sectarian or not whether read from King James Version, the English Revised, the Douai, or any of the many translations, or from any other book.

Colorado, Illinois, Kentucky, Minnesota, Pennsylvania and other states have ruled that Bible reading in the schools is not violative of a constitutional right when the student is not compelled to attend the exercise. In the Iowa case, Moore v. Monroe (1884), 64 Iowa 367, 20 N.W. 475, the court said that it could not regard the objection as having great weight, so long as the plaintiff's children were not compelled to be in attendance at a morning exercise where a selection from the Bible was read with a program including repeating of the Lord's Prayer and singing of religious songs. In the Kentucky case, Hackett v. Brooksville (1905), 120 Ky. 608, 87 S.W. 792, 69 L.R.A. 592, the court held that reading from the Bible, without comment, and giving an informal prayer in the public school does not make the schoolhouse a house of religious worship. In Billard v. Board of Education (1904), 69 Kan. 53, 76 P. 422, 66 L.R.A. 166, 105 Am St. Rep. 148, the Kansas Supreme Court held that the recitation of the Lord's Prayer and the Twenty Third Psalm from the Bible as a morning exercise, without comment, or remark — none of the students being required to participate — was not a form of religious worship, and did not violate sections of the bill of rights of the state or federal constitutions.

It would seem to this court that the Golden Rule should be observed by those selecting verses from the Bible to read so that the Old Testament when agreeable would be used and only verses not highly controversial would be read, in order not to offend any student or his parent.

A careful reading of these cases and the cases in those states that ruled otherwise and the United States Supreme Court opinions leads the writer to the following conclusion — (1) That the state law requiring the reading of the Bible, without sectarian comment, in the public schools, coupled with the defendant school board's ruling that a student may be excused from the exercise when requested, is not unconstitutional. (2) That in view of the foregoing, the reading of the Bible, without sectarian comment, where the student may upon request be excused, should not be enjoined.

One of counsel for the plaintiffs when asked by the court how he would like to see an injunctive order worded on the reading of the Bible in the schools, when many of the verses were in everyday usage, said that it should read, in his opinion — "Thou shall not read the Bible in the schools." *Arguendo:* it would seem then that the objection is to the fact that the verse is read *from the Bible* and not the fact that the verse is read without the student being told that it is a verse from the Bible or without the student knowing the verse was from the Bible.

There is nothing in the Florida law that requires that the student be told that it is a quotation from the Bible or that the student should be told from what book or verse the quotation was taken. If so, it might be considered sectarian comment, which is forbidden by the statute — but the court is not passing on that point of law.

There has been some comment to the effect that a pupil asking to be excused from the exercises is put to some disadvantage because of non-conformity and sometimes subject to ridicule or hostility because he asked to be excused. This matter was handled according to the testimony of a teacher in this case by sending two pupils on an errand who had asked to be excused from the exercise. The errand took approximately five minutes and no embarrassment was caused the students.

As was found in the findings of fact there is no evidence before the court except in an isolated incident that any comment or explanation was made on the verse read from the Bible and there is express restriction in the act itself from so doing.

As to distribution of Bibles in the schools, the testimony reveals that although under the administrator's handbook students may

be given the opportunity to accept, on a strictly voluntary basis, copies of the Holy Bible or the Holy Book of any other religious sect, provided the teachers conduct this distribution without sectarian comment, no Holy Bibles or Holy Books have been distributed under this policy since its enactment in 1956. No proof having been offered to the contrary, no injunctive order is necessary.

As to Bible instructions in school after school hours, there is proof in the record that after school hours Bible instructions are given on school premises on a purely voluntary basis. There is further proof that some schools have been used by churches of many denominations after school hours without charge from the school board and I find nothing in this case to conflict with the views expressed by the Supreme Court of Florida in its ruling in Southside Estate Baptist Church v. Board of Trustees, 115 So.2d 697. Although there seem to be two lines of decision on this matter, our Supreme Court in the cited case has followed the holding that —

> We find nothing in the conduct of the appellee trustees to suggest the involvement of public funds or property in the establishment of a religion or in preferring one religious faith over another. We agree with those courts which have observed that in the ultimate the American people are basically religious. Their spiritual or theological views might differ, but by and large, they are committed to the ideal that there should be a place for any and all religions in the scheme of our community and social life.

> . . . For example, if the use of the school buildings were permitted for prolonged periods of time, absent evidence of an immediate intention on the part of the church to construct its own building, we think it could hardly be contemplated that the public school system or its property could be employed in the permanent promotion of any particular sect or demonination.

> . . . We, therefore, hold that a board of trustees of a Florida school district has the power to exercise a reasonable discretion to permit the use of school buildings during non-school hours for any legal assembly which includes religious meetings, subject of course, to judicial review should such discretion be abused to the point that it could be construed as a contribution of public funds in aid of a particular religious group or as the promotion or establishment of a particular religion.

In the above case the appellee board of trustees permitted several churches to use various school buildings during Sunday, non-school hours. The authorization was for the *temporary* use of the buildings pending completion of construction of church buildings.

Counsel for the plaintiffs here contend that the Child Evangelism Fellowship is allowed the use of school buildings and children are there taught the Divinity of Christ, which organization has been conducting these non-denominational classes after school hours in various schools for a long period of time, and that such

use is not temporary but permanent. Students are excused from the programs upon request. This court believes that this appears from the evidence to be a continuing and permanent arrangement, not temporary, and should be enjoined.

As to religious hymns sung in the schools, there is evidence that some songs are sung which could be termed religious in nature around the Christmas and Easter holidays. The songs that were sung, such as "White Christmas," "Jingle Bells," "Silent Night," "O, Come all Ye Faithful," and others, are so closely interwoven with the thoughts of the Christmas and Hanukkah season that it would be impossible for this court to rule on songs that might be considered by some to be sectarian. Again, the student is not requested and compelled to attend the exercises where the songs are sung.

As to the saying of the Lord's Prayer, in schools, again the fact is ever present that the student may be excused upon request.

However, in Doremus v. Board of Education of Borough of Hawthorne (1950), 5 N.J. 435, 75 A. 2d 880, app. dism'd. 342 U.S. 429, 96 L. Ed. 475, 72 S. Ct. 394, a New Jersey case, it was —said —

> As to the permissive repeating of the Lord's Prayer: that short supplication to the Divinity was given its name because it was enjoined by Christ as an appropriate form of prayer. It is used by Roman Catholics and Protestants with slight variations. But nothing therein is called to our attention as not proper to come from the lips of any believer in God. His fatherhood, and His supreme power. Christ was a Jew and He was speaking to Jews: and it is said, on excellent Jewish authority, (Dr. Philip Bernstein, Rabbi of the Temple B'reth Kodesh, Rochester, N. Y., "What the Jews Believe," Life Magazine September 11, 1950, p. 161), that the prayer was based upon the ancient Jewish prayer called "the Kaddish" — "Exalted and hallowed be the name of God throughout the world * * * May His Kingdom come, His Will be done." *We find nothing in the Lord's Prayer that is controversial, ritualistic or dogmatic.* It is a prayer to "God, our Father." It does not contain Christ's name and makes no reference to Him. It is, in our opinion, in the same position as is the Bible reading and needs no special comment beyond what has just been said.

Again, in Engel v. Vitale (1960), a New York case, 206 N.Y.S. 2d 183, the Supreme Court, Appellate Division, referred to the so-called "Regents' Prayer", which is quoted as follows — "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our country." Also, in Engel v. Vitale, Justice Beldock said —

> I have no doubt that the *compulsory* recitation of a prayer in the classroom violates the constitutional provisions. I have concluded, however, that the prayer here involved (which I agree is non-sectarian and non-denominational), does not constitute religious teaching and, if voluntary and cir-

cumscribed by proper safeguards, does not violate the constitutional proscription of laws "respecting an establishment of religion." Nor do I find the prayer to be in conflict with recent decisional law on the related subject of teaching sectarian religion during the "released time" period.

From the point of view of policy I fully subscribe to the statement of principle in the Regents' Statement of Moral and Spiritual Training in the Schools, adopted November 30, 1951, to wit: "Belief in and dependence upon Almighty God was the very cornerstone upon which our Founding Fathers builded." It cannot be gainsaid that, above all things, it is essential for our children to be exposed to programs which emphasize the moral and spiritual heritage which is America's and to be inspired by the examples of their ancestors toward a greater respect for lawful authority, for love of God and respect for parents and home. However, we are not dealing with a matter of policy, but with one of power.

The basic issue here deals with the power of the school board to *direct* the recital of this prayer *on* school premises *under the supervision of the school teachers*. It is not disputed by the litigants that the prayer is of a religious nature. The main dispute is as to whether it is religious instruction and whether it is said by the students under compulsion.

I can see no vital difference in the Lord's Prayer and the Regents' Prayer in so far as it applies to the constitutional provision against the establishment of religion. The prayer for injunction to prevent the saying of the Lord's Prayer in the public schools of Dade County — so long as the rule providing for a student to be excused upon request prevails — will be denied. There being no believable testimony that grace is being said, there is no need for an injunction.

*Religious holiday observances.* — There is testimony that there are plays around Christmas depicting the Birth of Christ and around Easter of the Crucifiction of Christ, which could be termed religious teaching, and the same will be enjoined as being religious teachings on school property.

*Moving pictures.* — There is also testimony that moving pictures, which to some degree are religious in their nature as they depict various religious happenings, are shown to the pupils in schools, and the same should be and will be enjoined by this court from being shown in the public schools as being religious teachings.

*Religious symbols.* — There is testimony that Nativity scenes, made by the children in art work were displayed and that a Cross and the Star of Bethlehem were displayed on the outer cover of a Christmas school program and that the Star of David was displayed. To hold that these displays were such as to violate any constitutional rights of the plaintiffs and that such acts would be enjoined would be to hold that the children could not wear and display such symbols in school, such as a piece of jewelry and will not, therefore, be enjoined.

*Baccalaureate program.* — There is testimony to show that baccalaureate programs are held on school property and outside of school property at which programs a minister, priest or rabbi addresses the students. Such programs are held after school hours and attendance by the student is optional. This court cannot assume that at these programs religious teachings are resorted to by the rabbi, minister or priest. If testimony was in the record that such was true it would be enjoined, but as there is none, no injunction will issue.

*Religious census.* — There is no testimony before this court relative to any religious census being taken of the students in any of the schools by the school board. There are only one or two references in the testimony to a student's religion. One, where a teacher asked if there were any students who did not belong to a church, and the other where a teacher asked questions of religious preference of his students for his own personal knowledge. Such questions not being approved by the school board and being of such an isolated nature, no injunction will be granted.

*Religious tests for teachers.* — The only evidence of any religious test for teachers is that contained in the application forms for teachers, which is — "Do you believe in God?" I cannot see how such a question to a teacher can possibly be violative of any constitutional right *of the plaintiffs* in this case — while it might be considered if one of the plaintiffs were a teacher, no injunction will be granted as affecting the plaintiffs here.

An appropriate order will be entered by the court in accordance with the views expressed in this opinion.

*Final decree, May 10, 1961:* Pursuant to the findings of fact and opinions of law expressed in the court's opinion heretofore filed herein, it is ordered, adjudged and decreed —

That this court has jurisdiction of the subject matter hereof and of the parties hereto.

That the plaintiffs' prayer for injunction to prevent the saying of the Lord's Prayer in the public schools of Dade County, Florida, is denied, so long as the Dade County School Board's rule providing for a student to be excused upon request, is adhered to.

That the plaintiffs' prayer for the removal and enjoining of the display of religious symbols in the public schools is denied upon the ground that the religious displays were found by this court to be works of art created by the school children and were displayed on a temporary basis and not of a permanent nature. This court does not intend in any way to enjoin or prohibit school chil-

dren from displaying, upon their own persons, such religious symbols as they desire.

That the plaintiffs' prayer to enjoin baccalaureate programs held on school property and outside of school property is denied.

That the plaintiffs' prayer for an injunction to prohibit the taking of any religious census of the students in the schools is denied upon the ground that no proof was presented to this court showing that any religious census was being taken of any of the students by the school board.

That the plaintiffs' prayer for an injunction to prohibit any religious test for teachers is denied upon the ground that no violation of any constitutional right of the plaintiffs in this case has been shown.

That the plaintiffs' prayer to enjoin the singing of religious hymns in the schools is denied.

That the plaintiffs' prayer that section 231.09(2), Florida Statutes, be declared unconstitutional is denied upon the ground that the Dade County Board of Public Instruction has adopted the procedure that any pupil will be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian and, further, that if any non-academic activities in the schools be deemed by a parent or guardian to be violative of the religious conscience of such parent or guardian of any child in the public school system, such parent or guardian shall have the right to request the release of his child from participation therein and the various principals shall grant such request, making proper provision for the orderly care of such released children.

That the plaintiffs' prayer that the defendants be enjoined from showing motion pictures which are in some degree religious in nature and depict various religious happenings, principles, ideals and teachings is granted; and the defendants, their servants, agents and|or employees are permanently enjoined from showing motion pictures which are in some degree religious in nature and which depict various religious happenings, principles, ideals and teachings.

That the plaintiffs' prayer to enjoin the observance in the public schools of religious holiday ceremonies, such as plays around Christmas time depicting the birth of Christ, and around Easter, of the Crucifixion of Christ, and other religious holiday ceremonies on school property, is granted; and the defendants, their servants, agents and|or employees are permanently enjoined from

permitting the observance in the public schools of religious holiday ceremonies, such as plays around Christmas time depicting the birth of Christ, and around Easter, of the Crucifixion of Christ, and Hanukkah ceremonies, and other religious holiday ceremonies on school property.

That the plaintiffs' prayer that the defendants be enjoined from permitting use of school property by religious organizations after school hours is granted upon the grounds that the use of school property by said religious organizations is not temporary but a permanent arrangement; and the defendants their servants, agents and|or employees are enjoined from permitting, on a permanent basis, the use of school property by religious organizations after school hours.

That this court reserves jurisdiction for the purpose of entering such other and further orders necessary to carry out and enforce the terms and conditions of this decree.

That all pending motions are hereby denied.

That the costs of these proceedings be and they are herein taxed against the plaintiffs and the defendants, each party to bear its own costs.