Justice O’Connor,
concurring.
I join in the Court’s opinion. The First Amendment expresses our Nation’s fundamental commitment to religious liberty by means of two provisions — one protecting the free exercise of religion, the other barring establishment of religion. They were written by the descendents of people who had come to this land precisely so that they could practice their religion freely. Together with the other First Amendment guarantees — of free speech, a free press, and the rights to assemble and petition — the Religion Clauses were designed to safeguard the freedom of conscience and belief that those immigrants had sought. They embody an idea that was once considered radical: Free people are entitled to free *882 and diverse thoughts, which government ought neither to constrain nor to direct.
Reasonable minds can disagree about how to apply the Religion Clauses in a given case. But the goal of the Clauses is clear: to carry out the Founders’ plan of preserving religious liberty to the fullest extent possible in a pluralistic society. By enforcing the Clauses, we have kept religion a matter for the individual conscience, not for the prosecutor or bureaucrat. At a time when we see around the world the violent consequences of the assumption of religious authority by government, Americans may count themselves fortunate: Our regard for constitutional boundaries has protected us from similar travails, while allowing private religious exercise to flourish. The well-known statement that “[w]e are a religious people,” Zorach v. Clauson, 343 U. S. 306, 313 (1952), has proved true. Americans attend their places of worship more often than do citizens of other developed nations, R. Fowler, A. Hertzke, & L. Olson, Religion and Politics in America 28-29 (2d ed. 1999), and describe religion as playing an especially important role in their lives, Pew Global Attitudes Project, Among Wealthy Nations ... U. S. Stands Alone in its Embrace of Religion (Dec. 19, 2002). Those who would renegotiate the boundaries between church and state must therefore answer a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?
Our guiding principle has been James Madison’s — that “[t]he Religion... of every man must be left to the conviction and conscience of every man.” Memorial and Remonstrance Against Religious Assessments, 2 Writings of James Madison 183, 184 (G. Hunt ed. 1901) (hereinafter Memorial). To that end, we have held that the guarantees of religious freedom protect citizens from religious incursions by the States as well as by the Federal Government. Everson v. Board of Ed. of Ewing, 330 U. S. 1, 16 (1947); Cantwell v. Connecticut, 310 U. S. 296 (1940). Government may not coerce a per *883 son into worshiping against her will, nor prohibit her from worshiping according to it. It may not prefer one religion over another or promote religion over nonbelief. Everson, supra, at 15-16. It may not entangle itself with religion. Walz v. Tax Comm’n of City of New York, 397 U. S. 664, 674 (1970). And government may not, by “endorsing religion or a religious practice,” “mak[e] adherence to religion relevant to a person’s standing in the political community.” Wallace v. Jaffree, 472 U. S. 38, 69 (1985) (O’Connor, J., concurring in judgment).
When we enforce these restrictions, we do so for the same reason that guided the Framers — respect for religion’s special role in society. Our Founders conceived of a Republic receptive to voluntary religious expression, and provided for the possibility of judicial intervention when government action threatens or impedes such expression. Voluntary religious belief and expression may be as threatened when government takes the mantle of religion upon itself as when government directly interferes with private religious practices. When the government associates one set of religious beliefs with the state and identifies nonadherents as outsiders, it encroaches upon the individual’s decision about whether and how to worship. In the marketplace of ideas, the government has vast resources and special status. Government religious expression therefore risks crowding out private observance and distorting the natural interplay between competing beliefs. Allowing government to be a potential mouthpiece for competing religious ideas risks the sort of division that might easily spill over into suppression of rival beliefs. Tying secular and religious authority together poses risks to both.
Given the history of this particular display of the Ten Commandments, the Court correctly finds an Establishment Clause violation. See ante, at 867-873. The purpose behind the counties’ display is relevant because it conveys an unmistakable message of endorsement to the reasonable ob *884 server. See Lynch v. Donnelly, 465 U. S. 668, 690 (1984) (O’Connor, J., concurring).
It is true that many Americans find the Commandments in accord with their personal beliefs. But we do not count heads before enforcing the First Amendment. See West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 638 (1943) (“The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts”). Nor can we accept the theory that Americans who do not accept the Commandments’ validity are outside the First Amendment’s protections. There is no list of approved and disapproved beliefs appended to the First Amendment — and the Amendment’s broad terms (“free exercise,” “establishment,” “religion”) do not admit of such a cramped reading. It is true that the Framers lived at a time when our national religious diversity was neither as robust nor as well recognized as it is now. They may not have foreseen the variety of religions for which this Nation would eventually provide a home. They surely could not have predicted new religions, some of them born in this country. But they did know that line-drawing between religions is an enterprise that, once begun, has no logical stopping point. They worried that “the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects.” Memorial 186. The Religion Clauses, as a result, protect adherents of all religions, as well as those who believe in no religion at all.
* * *
We owe our First Amendment to a generation with a profound commitment to religion and a profound commitment to religious liberty — visionaries who held their faith “with enough confidence to believe that what should be rendered *885 to God does not need to be decided and collected by Caesar.” Zorach, 343 U. S., at 324-325 (Jackson, J., dissenting). In my opinion, the display at issue was an establishment of religion in violation of our Constitution. For the reasons given above, I join in the Court’s opinion.